OPINION OF THE COURT
Helen E. Freedman, J.
Tragically, Nicole Gilmore, an 11-year-old girl suffering from osteogenic sarcoma (bone cancer) was infected by the human immunodeficiency virus (HIV or AIDS virus) from one *955 or more of the 22 units of blood she received between March 6 and October 17, 1983 during surgical and chemotherapy treatment at Memorial Hospital for Cancer and Allied Diseases sued herein as Memorial Sloan Kettering Cancer Center (Hospital). In 1990, having been informed of her infection, plaintiff Gilmore sued Memorial Hospital, her orthopedist, Dr. Joseph M. Lane, and her oncologist, Dr. Lois Murphy. Each defendant moves for summary judgment on the ground that there are no triable issues of fact.
The claims as set forth in the complaint and amplified by the bills and amended bills of particulars fall into the following categories:
1. Defendant Hospital, its agents and servants were negligent in failing to test its blood supply and screen donors to prevent transfusion of blood or blood products contaminated with HIV.
2. Defendants failed to inform plaintiff and/or her mother in 1983 of the risk of transmission of HIV as a result of blood transfusions.
3. Defendants failed to timely diagnose plaintiff’s HIV status in that they ignored abnormal hemoglobin, hematocrit, ratio and other levels.
4. Dr. Murphy failed to timely inform plaintiff and/or her mother that Nicole was HIV positive and/or administer treatment to her.
Plaintiff acknowledges that AIDS was not identified until April 1984 and no reliable tests for the presence of the virus were available until March of 1985. However, she contends that certain steps should have been taken to minimize the risk of infection. First, she claims "surrogate marker tests” or tests for markers in blood associated with a population at high-risk of infection with sexually transmitted diseases, were available and should have been used. Second, she claims that the Hospital should have followed the recommendation of the Center for Disease Control (CDC) issued in late January of 1983 and instituted more aggressive methods for screening high-risk donors. Third, plaintiff claims that Drs. Lane and Murphy should have warned her or her mother of the risks of blood transfusions and provided the alternatives of autologous (her own previously donated blood) or directed donation transfusions.
In support of her claims, plaintiff furnishes several affidavits *956 by Dr. Kenneth Kizer,[1] Director of Emergency Medicine in California in 1983 and 1984 who is board certified in medical toxicology, preventive medicine and public health, emergency medicine, and occupational medicine and an affidavit by Gregory Gelles, Ph.D.,[2] an economist. Both opine that once it became apparent that the virus was blood borne in late 1982 and early 1983, it was incumbent upon institutions such as blood banks to utilize aggressive efforts to screen donors and test blood. Dr. Kizer states that by March 1983 enough was known about risk factors so that donors should have been asked more specific questions, and all potentially high-risk individuals should have been deferred. He also states that surrogate marker blood tests such as the hepatitis B core antibody test and the T-4, T-8 ratio test should have been used. Dr. Gelles discusses the economic feasibility of instituting screening and blood testing procedures and concludes that the cost would have been reasonable.
Movants contend that there were no reliable tests for the AIDS virus that could have been performed during 1983 inasmuch as the virus was not identified until 1984 and no FDA licensed tests were available to hospitals until March of 1985 and to blood banks until April of 1985. Defendant’s expert Dr. Jeffrey C. Laurence, Director of the Laboratory for AIDS Virus Research, Cornell University Medical College,[3] submits two affidavits contending that none of the three defendants were negligent. Dr. Laurence asserts that the "surrogate tests” were not accepted in the medical or scientific community as standard practice. He also claims that "these *957 tests have no utility, validity or reliability in screening blood for HIV.”
Dr. Laurence further claims that failure to inform plaintiff of the risks of transmission of HIV through blood transfusions or of the option of autologous or directed donation was not a departure inasmuch as it was not generally recognized by the medical community, the blood banking community or the Center for Disease Control that the AIDS virus was blood borne until 1984. Moreover, as a cancer patient, Ms. Gilmore was not a candidate for autologous transfusions and before 1985, directed donations had not been shown to decrease the risk of transmitting the AIDS virus.
Finally, Dr. Laurence disputes the allegations that defendants were negligent in not making the diagnosis earlier or in informing plaintiff or her mother that she was HIV positive sooner. He avers that the claimed signs and symptoms associated with HIV including abnormal CD4 and CD8 counts and low hematocrit, are the same as those associated with chemotherapy and are so nonspecific as to be "useless to diagnose infection with HIV.” With respect to the failure to timely diagnose and timely inform, there was no treatment available prior to 1989 when the first paper was published recommending prescription of AZT for asymptomatic patients. Nicole Gilmore received AZT as soon as she was eligible; and, as of June 15, 1993, the National Institute of Health considered AZT for asymptomatic HIV-infected patients, optional, as its benefits remain unverified. Dr. Laurence in his September 7, 1993 affidavit notes that Ms. Gilmore continues to be asymptomatic.
In a supplemental submission, defendant Hospital furnishes two pieces of documentary evidence indicating that limited procedures for screening out high-risk donors and testing blood were instituted in February 1983. The first is a memorandum dated February 22, 1983 issued by Dr. Klaus Mayer, Director of the Blood Bank and Hematology Department and Associate Chairman of the Department of Medicine at Memorial Hospital for Cancer and Allied Diseases, stating that the Hospital’s policy is not to exclude donors because they are gay, but to alert them to withhold blood donations if they believe that they may transmit an infectious disease. The memorandum also indicates that donor serum is tested for hepatitis and syphilis. The second document is minutes of a February 28, 1983 meeting of the Hospital Transfusion Committee showing that item 4 on the meeting agenda was a *958 discussion of a new policy concerning blood donors. The Transfusion Committee was informed that signs had been posted in the donor room, handouts had been distributed to prospective donors, and new questions had been added to the questionnaires "to expose those with early AIDS.” The signs and handouts explain why questions about blood borne infectious diseases are being asked. One of the inquiries is whether the prospective donor has been exposed to AIDS. Others relate to night sweats and recent blood transfusions.
What makes these issues so close is that so narrow a window period is involved. The state of scientific knowledge about AIDS at the precise time Nicole Gilmore received blood transfusions was still rudimentary. Although there was early evidence that blood transfusions were a source of AIDS, no virus or specific contaminant had been identified. The cases cited by the parties involve either earlier or later transfusion dates and are decided accordingly.
In Hoemke v New York Blood Ctr. (912 F2d 550 [2d Cir 1990]), the Second Circuit affirmed the granting of summary judgment to the New York Blood Center and to five physicians. Mrs. Hoemke received two units of blood in a transfusion at New York Hospital in November 1981 during kidney surgery. Her claim against the Blood Center involved failure to screen out gay male donors and failure to use the alanine aminotransferase (ALT) test (sometimes used to identify the hepatitis virus) to guard against blood borne diseases. The claims against her physician involving failure to advise her about autologous transfusions were dismissed on Statute of Limitations grounds. The latter claim was also ultimately dismissed against the hospital. The court found that the state of medical knowledge at the time concerning transmission of the AIDS virus as well as the standard of medical practice concerning autologous transfusions required dismissal of the claims against the hospital. The court also accepted the hospital’s claim that directed donations did not actually reduce the incidence of blood borne disease perceptibly. The court cautioned that even a short time after the Hoemke transfusion, the acceptable medical standard might well have been different.
Concerning Mrs. Hoemke’s claims against the Blood Center, the court found that in 1981, before AIDS had been discovered to be a blood borne disease, no standard of reasonable care could have required blood banks to screen out all gay male donors. In fact, such a practice could have been challenged as *959 discriminatory. (Hoemke v New York Blood Ctr., supra, at 554.) The evidence concerning efficacy of the ALT test in discovering AIDS-tainted blood was found to be unreliable.
Courts in New Jersey and New York found that by 1984, although HIV had not yet been identified, enough was known about the nature of transmission of AIDS through blood to preclude the automatic granting of summary judgment to blood banks.
Snyder v Mekhjian (244 NJ Super 281, 582 A2d 307 [1990], affd 125 NJ 328, 593 A2d 318 [1991]) involved an August 23, 1984 transfusion.[4] The New Jersey Appellate Division made specific findings relevant to the case at bar. Those findings are that at the end of 1982 the Center for Disease Control and the Public Health Services Committee On Opportunistic Infections reported to the blood banking community the likelihood that AIDS was transmitted through blood products and that the major risk groups for AIDS included homosexual males, intravenous drug users, recently emigrated Haitians and hemophiliacs. In early January of 1983, the CDC held a meeting with representatives of the blood banking industry, the National Gay Task Force and National Hemophiliac Foundation and reported that, despite reluctance to accept the hypothesis that AIDS was transmitted by blood, a consensus was reached " 'that it would be desirable to exclude high-risk donors’ ” (Snyder v Mekhjian, 244 NJ Super, at 287, 582 A2d, at 310). By the end of 1982, the CDC also reported the availability of surrogate tests (hepatitis B core antibody test and T-4, T-8 ratio test). According to CDC data, surrogate testing would identify between 66% and 88% of AIDS-infected donors. In March of 1983, the CDC recommended donor screening procedures and blood tests, and in January of 1984 the " 'national medical community officially recognized * * * that AIDS was transmissible through blood and blood products.’ ” (Supra, 244 NJ Super, at 289, 582 A2d, at 311.) National commercial blood bankers began screening in late 1982, Stanford University Blood Bank in July 1983, and other California blood banks by June 1984.[5] The American Red Cross and the American Association of Blood Banks did not perform such tests or aggres *960 sively seek to exclude high-risk donors until 1985.[6] The New Jersey court, while rejecting a cause of action in strict liability, felt that the foregoing facts were sufficient to establish causes of action against the Bergen County Blood Bank based on enhanced risk, even though none of the precautions available would have guaranteed that plaintiff would not have contracted HIV since the virus was not identified until April 1984 and the screening tests were not developed for another year. The conclusion acknowledges even the best tests would have missed between 12% and 33% of HIV-contaminated blood.
Based on a similar analysis of the available data, a New York court found that there were sufficient issues of fact to preclude summary judgment for the hospital blood in Doe v University Hosp. (148 Misc 2d 756 [Sup Ct, NY County 1990]). That case involved a January 1984 transfusion. The court there indicated that blood was identified as a source of infection by the end of 1982 and some hospitals instituted donor screening and surrogate testing in 1983.
The situation here is complicated by the fact that plaintiff received her first transfusion on March 6, 1983 and only six of the units transfused were obtained from Memorial Hospital’s blood bank; the remainder came from the New York Blood Center, run by the American Red Cross. Moreover, while the Hospital eschewed the most vigorous or aggressive donor screening policies in February of 1983, it appears that the Hospital instituted some donor screening at that time. Although surrogate marker testing is not recognized by Dr. Laurence, Dr. Kizer opines that it was useful to minimize risks and failure to perform such tests deviated from what should have been reasonable standards in the industry.
It is clear that despite the CDC’s recommendation that donor screening procedures and blood tests be instituted, it did not become standard practice to do so until late 1984 or early *961 1985. However, if the entire industry itself was slow to recognize changes and adopt appropriate precautions, such failure cannot inure to its benefit. (See, Hoemke v New York Blood Ctr., 912 F2d 550, 552, supra ["(o)f course, if a given industry lags behind in adopting procedures that reasonable prudence would dictate be instituted, then we are free to hold a given defendant to a higher standard of care than that adopted by the industry”]; see, The T.J. Hooper, 60 F2d 737, 740 [2d Cir 1932], cert denied sub nom. Eastern Transp. Co. v Northern Barge Corp., 287 US 662.) Although the CDC had made its recommendations just a month or two before Nicole Gilmore received her first transfusion, a triable issue of fact has been raised as to whether Memorial Hospital was negligent in not instituting more vigorous screening procedures of donors and/ or in not performing surrogate blood tests.
The claims against the individual physicians and the Hospital concerning failure to warn about the risks of transfusions and/or to offer autologous or a direct donor alternative are without merit and are dismissed. Although plaintiff’s expert, Dr. Kizer, asserts that defendants were negligent in not informing the Gilmore family of the risks of and alternatives to transfusions from the general blood supply, such a claim is inapplicable to this case. As an 11 year old suffering from cancer and undergoing chemotherapy, Nicole Gilmore was not a candidate for autologous transfusion. This is particularly true since she ultimately needed 22 units over a six-month period. Additionally, directed donations were considered neither an accepted medical practice nor a preferable mode for reducing the risk of transmission of AIDS in 1983. Since plaintiff was a young child suffering from a life-threatening cancer, the surgery was presumably not elective and, therefore, no reasonable parent would have withheld consent to either the surgery or the blood transfusions.
The claims against Dr. Murphy for first failing to diagnose and then withholding information concerning Nicole Gilmore’s HIV infection are problematic. With respect to failure to diagnose, the court agrees that there was insufficient medical evidence of HIV infection prior to 1987 to warrant an earlier diagnosis. The alleged symptoms were nonspecific and in any event, there was no treatment available.
With respect to the failure to inform, it is clear that Dr. Murphy knew or should have known about Nicole Gilmore’s HIV status by 1987. A letter dated November 27, 1989 from *962 Dr. Murphy to a Dr. Poplack at the National Cancer Institute states that Dr. Murphy accidentally discovered that Nicole Gilmore had a positive HIV antibody in 1987. Clearly, Dr. Murphy should have informed either the patient or her mother of that fact. Such nondisclosure constitutes a departure from good and accepted practices of medicine inasmuch as a patient has a right to be informed.
The knowledge would have been useful because once Ms. Gilmore was infected with the virus, it could have been transmitted to others. Fortunately, she did not engage in sexual relations or other high-risk behavior, and no family member has contracted the virus.
Ms. Gilmore was a college student at the time she became aware of her HIV status. She claims that the knowledge has made her depressed and forced her to drop out of school. She says that had she known earlier she would have planned accordingly. These two claims are inconsistent. It appears that the knowledge has been detrimental not beneficial to Ms. Gilmore. As soon as AZT became available for asymptomatic HIV-positive patients, Dr. Murphy informed the Gilmores and arranged for therapy to begin. In view of the absence of provable damages flowing from the failure to inform, that claim must also be dismissed.
Plaintiffs request further examination of Dr. Mayer concerning the recently proffered evidence of donor screening at Memorial Hospital starting in February 1983. In his earlier deposition, Dr. Mayer had stated that no tests for HIV were conducted in 1983. He was not specifically asked about donor screening. If counsel intends to have Dr. Mayer testify about anything more than is in the documents concerning donor screening, he must be made available for a brief examination on that subject. Otherwise it is not necessary to conduct a further deposition and the case shall proceed to trial.
Based on the foregoing, summary judgment is denied as to plaintiffs claim against the Hospital for negligence in not testing blood or screening donors and granted as to all other claims against the Hospital and individual physicians.

. Dr. Kizer was responsible for regulation of blood and tissue banks in California and oversaw and administered the State’s AIDS programs during his tenure with the California Department of Health. He was involved with developing and implementing State policies regarding HIV testing for blood and serum in California. He has written extensively about AIDS and blood.

. Dr. Gelles received a Ph.D. in economics in 1989 and states that he has conducted studies on the economics of various safety protocols to insure that blood donated for transfusions is free from the HIV virus. He is conducting a study concerning economic efficiency of court-ordered compensation in tort litigation resulting from transfusion acquired AIDS.

. Dr. Laurence is also editor-in-chief of The AIDS Reader, associate editor of The AIDS Research and Human Retroviruses, member of the editorial board of two other journals, publisher of 25 peer-reviewed articles on AIDS as well as numerous other articles on infectious diseases, holder of several United States patents relating to immunodeficiency and immunosuppression, and was a guest lecturer at the Pasteur Institute where he worked and published together with Dr. Luc Montaigne, discoverer of HIV.

. The affirmance relates to an interlocutory appeal of a discovery issue not pertinent to this case. All cites refer to the Appellate Division decision.

. On July 13, 1990, the Subcommittee on Oversight and Investigation of the United States House of Representatives Committee on Energy and Commerce conducted public hearings on the safety of the Nation’s blood supply. See, footnote in Snyder (supra, 244 NJ Super, at 290, 582 A2d, at *960 311, 312) for discussion of blood industry’s and government’s failure to prevent tranferring blood infected with AIDS virus. Stanford University’s Dr. Edgar Engelman testified before the subcommittee on July 13, 1990 that in July 1983, "we instituted surrogate testing on our blood donors in an effort to reduce transfusions transmitting AIDS * * * and we were quite surprised that the rest of the industry did not follow our lead but criticized us”.

. See, Schilts, And the Band Played On, for a discussion of the blood industry’s and government’s reluctance to admit that blood was a source of the AIDS virus.