[No. D026690. Fourth Dist., Div. One. Oct. 28, 1999.]

N.N.V., a Minor, etc., Plaintiff and Appellant, v.
AMERICAN ASSOCIATION OF BLOOD BANKS, Defendant and
Appellant;
RAQUEL V. LUGO, Defendant and Respondent.

## COUNSEL

Carney, Williams, Blackburn & Appleby, Carney, Williams, Blackburn, Appleby, Brewick & Maharry, Carney, Appleby & Brewick, James W. Carney; Higgs, Fletcher & Mack and John Morris for Plaintiff and Appellant.

Bond, Gamma & Associates, Charles Bond; Charles Bond & Associates, Charles M. Marx, Claudia J. Martin; O'Connor, Cohn, Dillon & Barr, Duncan Barr, Lisa Ungerer and Dexter Louie for Defendant and Appellant.

Jenner & Block, Jerald A. Jacobs, Robert M. Portman, Jeffrey T. Shaw; Catherine I. Hanson; and Thomas W. Greeson for California Medical Association, American College of Radiology, American Medical Association, American College of Surgeons, College of American Pathologists, American Association of Tissue Banks, American Society of Association Executives and National Fire Protection Association as Amici Curiae on behalf of Defendant and Appellant.

Hinshaw & Culbertson, Russell S. Roeca, Thomas K. Berg and Thomas J. Barrett for National Marrow Donor Program as Amicus Curiae on behalf of Defendant and Appellant.

Neil, Dymott, Perkins, Brown & Frank, Sheila S. Trexler, Hugh A. McCabe and Craig T. Mann for Defendant and Respondent.

## OPINION

**KREMER, P. J.**—N.N.V., a minor, appeals a judgment in favor of the American Association of Blood Banks (hereafter AABB) and Raquel V. Lugo, R.N., on his complaint seeking damages for developing acquired immune deficiency syndrome (AIDS) as a result of a blood transfusion during surgery in December 1984.

On appeal, N.N.V. contends the court erred in granting summary judgment in favor of the AABB on the basis the AABB owed no duty of care and had breached no duty of care owed to N.N.V. as to recommendations it made prior to December 1984 about reducing the risk of AIDS transmission

through blood transfusion. N.N.V. contends the court erred in failing to grant a new trial on Lugo's liability for allegedly failing to inform the surgeon of his parents' request to make directed donations of blood for his surgery (i.e., blood donations by family, friends or coworkers). N.N.V. contends a new trial should have been granted because the court improperly excluded his father's deposition testimony and Lugo's counsel committed misconduct during closing argument.

The AABB also appeals, contending the court erred in refusing to find it was immune from liability pursuant to Civil Code section 43.7, subdivision (b).[1]

We affirm.

## FACTS

### A. *The AABB*

The AABB is a professional, nonprofit scientific and administrative association that includes individuals and institutions engaged in blood banking and transfusion medicine. The AABB's membership includes about 9,000 individual members (e.g., physicians, medical technologists, administrators, blood donor recruiters and nurses) and 2,400 institutional members (e.g., community and regional blood centers, hospital blood banks and hospital transfusion services). The AABB's membership includes at least 25 percent of the persons or institutions involved in blood banking in the United States. The AABB together with the American Red Cross and Council of Community Blood Centers (CCBC) represent about 2,500 community and regional blood centers, hospital blood banks, and transfusion services that collect and transfuse over 98 percent of the nation's voluntary blood supply.

The AABB's mission statement states its goals include establishing and promoting "the highest standards of care for patients and donors through leadership in all aspects of blood banking, [and] transfusion medicine," developing and promoting "quality management and improvement programs for blood centers [and] transfusion services," increasing "professional educational opportunities," establishing "a legal, regulatory and public policy environment conducive to the effective and efficient operation of [its] members in providing the highest level of health-care services," actively

---

[1] We received amicus curiae briefs from National Marrow Donor Program, California Medical Association, American College of Radiology, American Medical Association, American College of Surgeons, College of American Pathologists, American Association of Tissue Banks, American Society of Association Executives, and National Fire Protection Association.

promoting "the application of basic scientific discoveries to the continuous improvement and enhancement of blood transfusion . . . practices," and developing "a mutually beneficial working relationship with other organizations, including state and regional blood banking associations, to address areas of common concern and to promote the AABB as the leader in its chosen field."

The AABB does not itself collect, prepare, test, process, store or distribute blood or blood products. The AABB, inter alia, promulgates voluntary standards for blood banking organizations and operates a voluntary system of accreditation and inspection of blood banks. The AABB's standards have been adopted by the Joint Commission on Accreditation of Hospitals as the standard for blood banking and transfusion services for hospitals. California has incorporated the AABB's standards as minimum standards into its statutory and regulatory provisions for blood banks and blood transfusion services. (Health & Saf. Code, § 1602.5, subd. (a)(1) [persons engaged in production of human whole blood and whole blood derivatives must be licensed and act in accordance with the AABB's standards]; Cal. Code Regs., tit. 17, §§ 1024, 1024.1 [preparation of red blood cells], 1002, subd. (d) [pretransfusion procedures must meet the AABB or equivalent standards].)

## B. *AIDS and Blood Transfusions*[2]

By December 1982 there was evidence suggesting AIDS could be transmitted through the transfusion of blood products; the Centers for Disease Control (CDC) reported on December 10, 1982, that an infant who had received blood platelets had been diagnosed as possibly suffering from AIDS. The CDC convened a conference on January 4, 1983, to address the possibility AIDS could be transmitted through blood transfusion.

At the January 1983 CDC meeting, some persons expressed doubts whether there was a risk of AIDS transmission by the transfusion of whole blood, while others were certain that AIDS could be transmitted by blood products. Various recommendations were made as to ways to ensure the safety of the nation's blood supply, but no consensus was reached. Among the recommendations made was a proposal to directly question donors as to whether they were a member of one of the high-risk groups then identified as homosexuals, hemophiliacs, intravenous (IV) drug users and Haitians. There

[2]For overviews of this area, see Eckert, *The AIDS Blood-Transfusion Cases: A Legal and Economic Analysis of Liability* (1992) 29 San Diego L.Rev. 203-231, 295-298; Note, *Snyder v. American Association of Blood Banks: Expansion of Trade Association Liability—Does It Reach Medical Societies?* (1997) 29 U. Tol. L.Rev. 149, 153-156; *Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 259-263 [7 Cal.Rptr.2d 101].

was considerable disagreement about this proposal, with members of the National Gay Task Force expressing concerns about whether direct questioning would be ethical or fair, while the National Hemophilia Foundation Resources Association urged adoption of the proposal.

Another suggested proposal was the use of surrogate testing. A surrogate test detects a disease that is commonly associated with the target disease.[3] A CDC immunologist, Dr. Thomas Spira, indicated the most successful test was the anti-HBc test, which tested for the antibody to the hepatitis B core antigen (hereafter anti-HBc test), since hepatitis B was prevalent in the same populations that were at high risk for AIDS and the antibody to the core antigen remained elevated even after recovery and thus would identify all persons who had had hepatitis B. He conducted a study on persons who had developed AIDS or its "prodromal illnesses." According to Spira, the test yielded positive results in 90 to 100 percent of AIDS patients in the various groups, and yielded positive results in 90 percent of persons with "lymphadenopathy, a prodrome of AIDS." However, there was only one manufacturer of commercial kits to test for the hepatitis B core antigen, and it was unclear whether this test could be rapidly and efficiently made available. Also raised were concerns about the cost of the test. Additionally, a member of the American Red Cross expressed concerns about the fact the test would have positive results in 5 percent of the normal population who did not have AIDS; he noted a recent major newspaper had headlined an article on AIDS as "Lethal Disease Kills Victims," and wanted to know how to explain to people that their blood was being rejected but they were still healthy. CDC officials, because of the disagreements expressed at the meeting, did not issue any recommendations.

On January 13, 1983, the AABB, American Red Cross and CCBC issued a joint press statement on AIDS related to transfusion. These organizations cited assistance in developing their statement from the American Blood Commission, National Gay Task Force, the National Hemophilia Foundation Resources Association, the CDC and the Food and Drug Administration (FDA). In the joint statement the organizations stated: "There is currently considerable pressure on the blood banking community to restrict blood donation by gay males. Direct or indirect questions about a donor's sexual preference are inappropriate. Such an invasion of privacy can be justified only if it demonstrates clear-cut benefit. In fact, there is reason to believe

---

[3]"Surrogate testing in this context refers to 'identifying people who are at risk for a disease by testing for some symptom or characteristic manifested by a majority of people who have contracted or are at risk of contracting the disease." (Note, *Snyder v. American Association of Blood Banks: Expansion of Trade Association Liability—Does it Reach Medical Societies?*, *supra*, 29 U. Tol. L.Rev. at p. 149, fn. 47.)

that such questions, no matter how well-intentioned, are ineffective in eliminating those donors who may carry AIDS. Blood banks should work with the leadership of groups which include some individuals at high risk of AIDS."

The January 13, 1983, joint statement also noted "[w]hile there is no specific test for AIDS, there are laboratory and clinical findings that are present in nearly all AIDS patients. The use of these non-specific markers, for example, lymphopenia, immune complexes, and anti-HBc, are being evaluated in those areas of the country where AIDS is prevalent." The organizations did not recommend routine use of any of these tests at that time.

In March 1983 the Public Health Service recommended, as a temporary measure, that persons in the high-risk groups should refrain from donating blood and studies should be conducted to evaluate screening procedures for their effectiveness in identifying and excluding blood products with a high probability of transmitting AIDS.

In June 1983 the AABB, American Red Cross and CCBC issued another joint news release. In this news release, the organizations addressed the question of directed donations, i.e., patients requesting blood for their transfusions be donated by specially selected family members, friends or coworkers. The organizations stated, "[T]here is no scientific basis for the assumption that blood from donors selected by patients is safer than that available from volunteers at community blood banks. In fact, such a practice may be hazardous because it could pressure selected donors to be untruthful about their ability to meet donor eligibility requirements." The organizations believed "[a]dopting a policy of patient-directed donations would create an illusion of additional protection where none exist[ed] and, by disrupting existing volunteer donor systems, could result in inability to supply blood to patients who need it." The organizations noted concerns "that the logistical complexities of patient-directed donation could lead to serious errors in donor and patient identification." The joint news release noted, "[D]ata accumulated over the last three years indicate that the possible occurrences of AIDS in transfusion recipients is on the order of one case per million patients transfused."

In late December 1983, the AABB sent a memorandum to its members noting, among other things, that it was important to allow donors confidentiality and the ability to discreetly, either at the time of donation or following donation, communicate that their blood should not be used. As to laboratory tests, the AABB while noted there was no specific test for AIDS, several

surrogate tests for AIDS had been proposed, but none had recognized "the carrier state," and the AABB would inform its members of any recommendations resulting from a recent workshop by the Office of Biologics of the FDA on the matter. As to directed donations, the AABB noted it anticipated that some patients and physicians would request directed donations but the AABB continued to "believe that directed donation programs are not in the best interest of the large number of recipients who depend on our nation's voluntary blood system." Finally, the AABB noted the number of transfusion-related cases being examined as of December 8, 1983, was 40 and the incidence of transmission of AIDS via blood transfusion was "extremely low."

In 1983 Dr. Herbert Perkins, then a member of the AABB's board of directors and medical director of Irwin Memorial Blood Bank, instituted a study of whether the anti-HBc test could be used as a surrogate test for AIDS. His study concluded there was no indication the test "would work as a reasonable surrogate test for AIDS in a blood bank setting." In the study, while expecting a high incidence of hepatitis B core antibody positivity in a gay neighborhood of San Francisco, the researchers also found "a high rate of hepatitis B core antibody positivity in areas with a high proportion of Chinese residents, where there was a low incidence of AIDS." Thus, the study could draw "[n]o reasonable correlation . . . between the results [they] obtained and AIDS rates . . . ."

The government funded studies of surrogate tests, but when the putative agent for AIDS was discovered, focus shifted to developing the enzyme-linked immuno-sorbent assay test, the blood test for AIDS. Announcement that researchers had isolated the AIDS virus and had developed a blood test for AIDS was made in April 1984. (*Snyder* v. *American Ass'n of Blood Banks* (1996) 144 N.J. 269, 292 [676 A.2d 1036, 1048]; *Brown* v. *United Blood Services* (1993) 109 Nev. 758, 762-763 [858 P.2d 391, 394].) It was also indicated the test (now known as ELISA) would be available in six months. (*Snyder* v. *American Ass'n of Blood Banks, supra,* 676 A.2d at p. 1048.) The FDA approved the test in March 1985. (*Ibid.*)

In December 1984 there were between five and ten blood banks in the country, primarily in the San Francisco Bay Area, that had instituted anti-HBc testing. Prior to December 1984, neither the FDA, CDC, the National Institutes of Health nor any branch of the Public Health Service had recommended the use of surrogate testing of blood donors. Nor had the FDA or Public Health Service recommended directed donations before December 1984.

## C. *N.N.V.'s Surgery*

N.N.V. was born on September 23, 1984, with a congenital heart defect. Surgery was performed on December 6, 1984, at Donald N. Sharp Memorial Hospital (Sharp Hospital) to correct this defect.[4] According to N.N.V.'s mother, R.V., the night before the surgery she asked Raquel Lugo, a nurse, about family and friends donating blood for the surgery. Lugo was a pediatric nurse coordinator for the Pediatric Cardiology Medical Group who had translated for R.V. and her husband, N.V., both of whom were Spanish speaking. R.V. testified she and her husband talked with Lugo from about 7:00 to 9:00 p.m. on December 5, 1984, in the waiting room of the hospital. Lugo said "not to worry, everything is taken care of," and although Lugo believed it was too late to do directed donation, she said she would mention R.V.'s request to the doctors.

Lugo testified she had no specific recollection of a conversation with N.N.V.'s parents before the surgery; however, her custom and practice was to communicate any request from a family member regarding the surgical procedure to the doctor. She would have been obligated to communicate a request for directed donations to the doctor.

Dr. John Lamberti, of the Pediatric Cardiology Medical Group who performed the surgery, testified it would be "most unusual" for Lugo not to tell him something the family had requested, and it would be unusual for him not to make a comment about a request for directed donation on his "consult form." There was no notation on the consult form about a request for directed donation from the parents. Lamberti felt certain if Lugo had had such a conversation with the parents, he would have known about it; she told him everything.

Nursing notes from the hospital indicated R.V. was breast-feeding N.N.V. at 7:30 p.m. on the night before the surgery. The nurse who signed this note was not Lugo. The consent form for the surgery was signed about 8:00 p.m. The signature of the witness to the consent form for N.N.V.'s surgery was the same as that of the nurse who had made the entry about R.V. breast feeding. Lugo was not the witness on the consent form.

In early April 1989, N.N.V.'s parents were told one of the persons who had donated blood used in N.N.V.'s surgery was dying of AIDS. Shortly thereafter N.N.V. was diagnosed as HIV positive.

---

[4]N.N.V. was hospitalized at Children's Hospital and Health Center (Children's Hospital) before and after the surgery performed at Sharp Hospital.

## D. *Procedural Background*

### 1. *N.V.'s Deposition*

In April 1992 N.N.V. obtained a court order pursuant to Code of Civil Procedure section 2035 authorizing the taking of N.V.'s deposition before the filing of the complaint to preserve N.V.'s testimony. Notice was given to Children's Hospital, Sharp Hospital, "Raquel V. Lugo, R.N. c/o Hospital Counsel" for Sharp Hospital, "Raquel V. Lugo, R.N. c/o Hospital Counsel" for Children's Hospital, and Does 1 to 25. Present at the deposition taken on May 15, 1992, were Sharp Hospital, the San Diego Blood Bank, and Children's Hospital. N.V. died before trial.

### 2. *AABB's Summary Judgment*

The AABB made a motion for summary judgment, inter alia, on the grounds it owed no duty to N.N.V., breached no duty of care, and was entitled to immunity under Civil Code section 43.7, subdivision (b). In opposition to the motion, N.N.V. presented the depositions of various experts who testified the AABB was negligent in not recommending direct questioning of donors, directed donations and surrogate testing.

As to direct questioning of donors, Dr. Theodore Koerner testified in a deposition that blood bankers should not have been afraid to "hurt" the feelings of would-be donors when the lives of patients were involved. He noted "compelling arguments" in favor of direct questioning had been raised at the January 1983 CDC meeting, but he was not aware of any studies before December 1984 demonstrating that direct questioning was better than the methods advocated by the AABB.

As to directed donations, Dr. Koerner stated blood banks were discouraged from doing directed donations because the AABB in June 1983 had recommended against directed donations. Dr. Koerner, however, could not name any institution that had not offered directed donation due to the AABB's recommendation. He noted his blood bank in New Orleans was not stigmatized by offering directed donations because it had offered directed donations for a long time, and stated "most people found a way to offer it, because the AABB's opinions did not have the power of law behind them." He believed directed donations may have been curtailed in some circumstances due to the AABB regulations, and believed that if the AABB had encouraged directed donations, then the nurse in this case would have known it was important and it would have occurred in this case.

As to surrogate testing, Dr. Koerner stated the AABB should have advocated surrogate testing at least as of July 1983 in high-risk areas. He stated

San Diego was a high-risk area but acknowledged he could not cite any facts to support his assertion San Diego was a high-risk area; his claim was based on statewide data for California. He acknowledged there was no consensus in the blood banking community that surrogate testing should have been done. Dr. Koerner believed the AABB "did not promulgate all the information that they had as to the usefulness of surrogate testing, that if that in fact had been done, if they had fulfilled their charge to do that, then more blood bankers would have done surrogate testing." He believed the American Red Cross, the CCBC, FDA and CDC (as well as the AABB) were wrong for not advocating surrogate testing in high-risk areas and "for not sharing the information that they had with everybody and let everybody decide."

Koerner testified he had seen an American Red Cross memorandum that indicated the transmission rate for AIDS was 1 in 1,000 but he did not know if the AABB had seen that memorandum. Koerner also testified that he had no opinion of what the rate was in December 1984.

Dr. Roy Dawson held the opinion the rate was 1 in 10,000. It is unclear from the record when the opinion of a 1-in-10,000 transmission rate was reached. Dawson stated the AABB breached the standard of care existing in December 1984 "by not doing all it knew how to do to minimize the risk of transfusion transmitted AIDS," including direct questioning, surrogate testing and directed donation. He believed there was a good chance N.N.V. would not have been infected if his family and friends had donated blood for his surgery, but acknowledged it was possible that one or more of this group could have been an asymptomatic HIV-infected individual.

Dr. David Smith, in a deposition, indicated the risk of acquiring AIDS through blood transfusion in December 1984 was 1 in 10,000 or 1 in 20,000 transfusions. It is unclear whether this opinion of the transmission rate existed in December 1984 or was later developed.

Dr. Donald Francis testified in a deposition that he had recommended the CDC require surrogate testing in January 1983. He believed if the CDC had recommended surrogate testing, then the AABB would have been forced to act. He regretted that he and others had failed to more actively pursue surrogate testing after the January 1983 CDC meeting. He believed blood banks were being irresponsible in not doing surrogate tests and direct questioning between January 1983 and July 1984. He believed the AABB and other blood bankers tried "to stall, to sidetrack CDC," "were constantly trying to interfere," and there were difficulties initially to have blood banks "do[ing] investigations of transfusion-associated cases" because "[t]hey constantly downplayed the issue and constantly fought against [the CDC]."

In contrast to these experts, Dr. Paul Holland in his deposition stated he believed implementation of surrogate testing "would have increased the individuals at risk coming into the blood bank." He noted that use of the surrogate test possibly could have attracted "into blood banks a lot of people who were at risk of AIDS who would have donated blood to get that test." He also noted surrogate testing "would be more expensive" since it would involve notifying people who had tested positive and doing repeat testing. Dr. Holland additionally noted one of the reasons the anti-HBc test was not used was because the FDA had not licensed or approved the product to be used by blood banks for screening purposes. He also testified in his deposition that use of the anti-HBc surrogate test may have prevented about 21 percent of the cases.

Dr. Herbert Perkins, a member of the AABB's board of directors during the relevant period, testified as to the results of his own study about the use of the anti-HBc test as a surrogate test for AIDS. He stated he could draw "[n]o reasonable correlation . . . between the results [he] obtained and AIDS rates." He also stated that while on the board of directors he was "aware of studies undertaken at the New York Blood Center, which were far more extensive and which also showed the lack of utility of surrogate testing." He noted several of the blood banks in the San Francisco Bay Area felt "compelled" to adopt surrogate testing once Irwin Memorial Blood Bank had instituted the surrogate test.

Dr. Perkins stated the AABB acted on the assumption AIDS could be transmitted through blood products. He explained his blood bank, Irwin Memorial Blood Bank in San Francisco, adopted directed donations because they were losing patients to Stanford's blood bank, which had adopted directed donations.

Dr. Perkins did not believe the AABB was negligent. He stated the AABB's recommendations in 1983 and 1984 about direct questioning, directed donations and surrogate testing "were thought then to be the appropriate scientific approach to the emerging AIDS crisis." Perkins also noted the FDA did not modify the procedures it had recommended in 1983 until late December 1984. Nor did the FDA or Public Health Service before December 1984 recommend direct questioning or directed donations. Neither the FDA, CDC, National Institutes of Health nor any branch of the Public Health Service recommended surrogate testing of blood donors for AIDS before December 1984.

Summary judgment was granted in favor of the AABB on the grounds the AABB owed no duty of care to N.N.V., and even if a duty were owed, it was not breached.

### 3. *Other Defendants*

Summary judgment was granted in favor of the doctors based on the statute of limitations. Summary judgment was granted in favor of San Diego Blood Bank on the ground N.N.V. had failed to raise any triable issues of fact to show the blood bank had violated the applicable standard of care. As to the hospitals, summary judgment was granted in favor of Sharp Hospital, and N.N.V. voluntarily dismissed its action against Children's Hospital.

### 4. *Nurse Lugo's Judgment*

Trial proceeded only against Lugo on a cause of action for negligence. The jury found she was not negligent. The court denied N.N.V.'s motion for a new trial based on the exclusion of N.V.'s deposition and misconduct by Lugo's counsel during closing.

### DISCUSSION

### *N.N.V.'S Appeal*

### I

### *Duty of Care*

N.N.V. argues the AABB, having voluntarily undertaken to set standards for blood banks to ensure the safety of the nation's blood supply, owed a duty of care to patients who were foreseeable victims of negligence in setting the standards. The AABB argues no duty should be imposed on a professional society arising out of voluntary recommendations that its members could accept or reject and, further, as a matter of public policy and fairness, liability should not be imposed for promulgating recommendations in good faith when scientific knowledge is in doubt or technology is not fully developed.

### A. *General Principles*

"Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection." (*Adams* v. *City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196]; *Hoff* v. *Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933 [80 Cal.Rptr.2d 811, 968 P.2d 522].) The existence of a duty of care is a question of law to be resolved by the courts. (*Quelimane Co.* v. *Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57 [77 Cal.Rptr.2d 709,

960 P.2d 513]; *Armato* v. *Baden* (1999) 71 Cal.App.4th 885, 893 [84 Cal.Rptr.2d 294].) "Entry of summary judgment in favor of the defendant in a professional negligence action is proper where the plaintiff is unable to show the defendant owed such a duty of care." (*Nichols* v. *Keller* (1993) 15 Cal.App.4th 1672, 1682 [19 Cal.Rptr.2d 601].)

While California statutory law generally provides that everyone is liable for injuries caused by their failure to exercise reasonable care, public policy and other considerations may lead a court to conclude no duty toward the plaintiff existed in a particular case. (See Civ. Code, § 1714, subd. (a); *Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

■ In deciding whether a duty was owed in a particular case, the courts look to several factors, including " ' "the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." ' " (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1079-1080 [9 Cal.Rptr.2d 615, 831 P.2d 1197]; *Randi W.* v. *Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1077 [60 Cal.Rptr.2d 263, 929 P.2d 582]; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

### B. *Section 324A of the Restatement Second of Torts and the FNS Case*

■ N.N.V., relying on section 324A of the Restatement Second of Torts (hereafter section 324A), argues since the AABB voluntarily undertook to set standards to ensure a safe blood supply, the AABB should have recognized the standards were necessary to the protection of third persons (i.e., patients such as N.N.V.), and therefore the AABB should be subjected to liability for a failure to exercise reasonable care in setting those standards when their standards caused harm to a patient such as himself. N.N.V. argues the case of *FNS Mortgage Service Corp.* v. *Pacific General Group, Inc.* (1994) 24 Cal.App.4th 1564 [29 Cal.Rptr.2d 916] (hereafter *FNS*) supports his position that a trade association such as the AABB should be held liable for negligently setting standards.

Section 324A provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a

third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

In *FNS*, a suit was brought against the International Association of Plumbing and Mechanical Officials (hereafter IAPMO), a trade association that promoted uniformity in the plumbing trade through its Uniform Plumbing Code (UPC), which has been adopted by virtually all public entities. IAMPO listed plumbing products that had been found to meet UPC standards in its plumbing research directory. A pipe that is not listed and does not bear the UPC logo is unmarketable because building inspectors will not sanction its use. Suit was brought against the IAPMO for listing plastic pipes manufactured by Centaur Manufacturing despite the fact IAPMO had found Centaur's pipes were defective because they used recycled materials and failed to meet thickness standards.

The *FNS* court, citing section 324A, found IAPMO had undertaken "the service of inspecting pipe manufacturers and delisting those who are unwilling or unable to adhere to standards it has promulgated" for the protection of third parties (consumers who would buy and install the pipe), and IAPMO should have recognized its services were necessary for protection of the consumers. (*FNS, supra,* 24 Cal.App.4th 1564, 1572.) The court pointed out ". . . such protection is one of IAPMO's avowed purposes." (*Ibid.*) The court further found IAPMO had arguably "undertaken to perform a duty owed by local building officials to consumers." (*Ibid.*) The court concluded the consumers "suffered harm because of the reliance of local building officials upon IAPMO's undertakings," and IAPMO was "subject to liability to consumers under the principles of section 324A for physical harm resulting from its failure to exercise reasonable care in its undertakings." (*Ibid.*)

The *FNS* court rejected IAPMO's arguments (1) it was not foreseeable that Centaur Manufacturing would continue to manufacturer defective pipes after IAPMO had informed it of the defects, and (2) that the imposition of liability would cause IAPMO to withdraw from inspecting and certifying manufactured products. (*FNS, supra,* 24 Cal.App.4th 1564, 1575-1576.)

Initially, we note the *FNS* decision is clearly factually distinguishable from N.N.V.'s case. Here, the issue is not the AABB's role as a trade association that inspects and certifies blood banks, i.e., there is no claim here that the AABB improperly inspected or accredited a particular blood bank in this case. At issue here is the AABB's liability for setting standards. The *FNS* case did not address the liability of a trade association based on its professional judgment in recommending standards to be used in the industry. Moreover, the *FNS* holding of liability was based not merely on section 324A but also on a consideration of the various factors relevant to determining whether a duty exists. Our examination of those factors, as we explain below, leads us to conclude liability should not be imposed on the AABB in this case.[5]

### C. *Analysis of Factors Relevant to Determining Whether a Duty Exists*

#### 1. *Foreseeability of Harm*

■ "[F]oreseeability of harm [is] the primary and threshold consideration in determining" whether a duty exists. (*Ludwig* v. *City of San Diego* (1998) 65 Cal.App.4th 1105, 1111 [76 Cal.Rptr.2d 809].) If a court concludes the injury was not foreseeable, then there is no duty. (*Sturgeon* v. *Curnutt* (1994) 29 Cal.App.4th 301, 306 [34 Cal.Rptr.2d 498].) " '[W]ithout evidence that a defendant knew or reasonably should have known there was any danger or potential danger associated with that defendant's act or failure to act, any imposition of liability would in essence be the imposition of liability without fault.' " (*Ludwig* v. *City of San Diego, supra*, 65 Cal.App.4th at p. 1111.)

"Foreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678 [25 Cal.Rptr.2d 137, 863 P.2d 207].) In determining foreseeability, it is important to keep in mind the nature of the risk or harm being assessed. Thus, for example, the court in

---

[5]The AABB argues its standards were voluntary minimum recommendations to its members and did not prohibit its members from instituting additional safeguards. Further, the AABB points out it lacked any direct involvement with N.N.V. and did not take specific responsibility for a particular product. Thus, the AABB argues it has no liability under section 324A.

We note there is evidence in the record indicating that despite the AABB's recommendations, there were blood banks engaged in direct questioning and surrogate testing. However, there was also other evidence in the record suggesting blood banks could be stigmatized for failing to follow the AABB's recommendations and that AABB accreditation was believed to be important by many blood banks. The record thus presents some factual conflicts on this issue. We need not reach this issue because we conclude on other grounds that the AABB did not owe or breach any duty of care to N.N.V.

*Salazar* v. *Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1381-1382 [63 Cal.Rptr.2d 522], pointed out: "It is undisputed that harm from a gas-fired water heater when flammable substances are stored or used nearby is foreseeable. What is not foreseeable, however, is that the harm is more likely if the water heater is not elevated."

 Here, N.N.V. in his appellate briefs does not clearly delineate what risk·or risks he believed were foreseeable. At one point, N.N.V. characterizes the foreseeability question as "whether the failure of the AABB to conduct itself according to the appropriate standard of care would foreseeably result in harm to patients receiving blood transfusions." This characterization begs the question; N.N.V. has merely restated the general principles of negligence liability and does not address the facts of this case.

N.N.V. also seems to argue foreseeability in terms of whether blood banks would follow the recommendations of the AABB and in terms of whether it was foreseeable that AIDS could be transmitted through a blood transfusion. While it may have been foreseeable that blood banks would follow the recommendations of the AABB or that AIDS could be transmitted through a transfusion, such a foreseeability analysis does not reach the basis of the liability claimed here. N.N.V.'s claim is that the AABB was negligent in failing to make three particular recommendations, i.e., direct questioning, directed donations and surrogate testing, which N.N.V. claims would have reduced the risk of AIDS contaminated blood supply. Thus, the question presented in this case is whether at the time of N.N.V.'s surgery it was reasonably foreseeable that direct questioning, directed donations and/or surrogate testing would have reduced the risk of AIDS contamination of the nation's blood supply.

### (a) *Direct Questioning of Donors*

At the January 1983 meeting convened by the CDC, there was no consensus as to whether direct questioning should be instituted. The AABB, as well as the American Red Cross and CCBC, concluded direct questions about a donor's sexual preferences were ineffective in eliminating donors who carried AIDS. In reaching this conclusion, the blood banking organizations had consulted with the American Blood Commission, National Gay Task Force, the National Hemophilia Foundation Resources Association, the CDC and the FDA. (See, e.g., Joint Statement on Acquired Immune Deficiency Syndrome (AIDS) Related to Transfusion, dated Jan. 13, 1983, 23 Transfusion 87 (1983); Joint Statement on Directed Donations and Aids (June 22, 1983) by AABB, Am. Red Cross and CCBC, June 22, 1983.) In December 1983, the AABB in a memo to its members reaffirmed its belief. Direct questioning was rejected because it was intrusive, stigmatized an entire group (gay

men) of whom only a small number had AIDS, and was not likely to be effective in eliminating high-risk groups from the donor pool since many gays would not self-identify or would not respond truthfully to the questionnaire.[6] Advantages of direct questioning included its low cost and simplicity.

N.N.V. presented no evidence showing that as of December 1984 there was any scientific or other basis for concluding direct donor questioning was more effective in reducing the risk of AIDS transmission by blood donors than the recommendations for educating the public, discouraging donation by high-risk groups and self-deferral by donors in the high-risk groups. For example, there was no evidence of any studies conducted before December 1984 showing that direct questioning of individuals was more effective than education and self-deferral.[7]

Given the lack of any consensus in the relevant medical and scientific community about direct questioning, the existence of reasons to believe direct questioning would not be effective in reducing the risk and the lack of any contradictory studies, we conclude it cannot be said that in December 1984 it was reasonably foreseeable that direct questioning would have been effective in reducing the risk of AIDS transmission by blood transfusion.

### (b) *Directed Donations*

In the June 1983 joint news release by the American Red Cross, the AABB and the CCBC, the organizations stated, "[T]here is no scientific basis for the assumption that blood from donors selected by patients is safer than that available from volunteers at community blood banks. In fact, such a practice may be hazardous because it could pressure selected donors to be untruthful about their ability to meet donor eligibility requirements." The organizations concluded, "[T]he altruistic volunteer donor who is free from coercion or expectation of gain is the safest blood donor."

As with the direct questioning issue, there was no medical or scientific consensus in favor of directed donation nor any studies demonstrating

---

[6]As explained in *Doe* v. *American Nat. Red Cross* (D.Md. 1994) 866 F.Supp. 242, 246, when the American Red Cross in March 1983 held meetings with members of the gay community about instituting a policy of asking direct questions of all male donors about their sexual preferences and practices, " '. . . virtually all participants in the meeting strongly opposed this proposal and felt that potential donors would not answer such direct questions truthfully because of fear of stigmatization.' " Indeed, there was a threat by one participant that " '. . . he would instruct all homosexual men affiliated with his organization to lie if the Red Cross questioned them about their sexual orientation as part of the health history screening process.' " (*Ibid.*) This reaction was reported in the press. (*Ibid.*)

[7]*Doe* v. *American Nat. Red Cross, supra*, 866 F.Supp. 242, 248, noted studies on the efficacy of direct questioning were conducted in 1987 and 1988 and were published in 1989.

directed donation was more effective than using the system of using volunteer donors at blood banks in reducing the risk of AIDS transmission through blood transfusion as of the time of N.N.V.'s surgery.[8] N.N.V. did not present any evidence raising a triable issue of fact as to whether it was reasonably foreseeable in December 1984 that directed donation was more effective than using the volunteer donor system in reducing the risk of AIDS transmission.

### (c) Surrogate Testing

At the January 1983 CDC meeting, Dr. Spira suggested a very high percentage of the AIDS high-risk groups would have positive results on the anti-HBc test as a result of his study, including persons who had developed AIDS and its "prodromal illnesses." Subsequent studies in San Francisco (by the AABB's board of directors' member Dr. Perkins) and in New York concluded the anti-HBc test would not work as a reasonable surrogate test for AIDS in a blood bank setting; the positive result rates for the anti-HBc test could not be correlated with AIDS rates. As of December 1984, there were only five to ten blood banks using surrogate testing to screen blood for AIDS.

The primary reasons for not using the anti-HBc surrogate test included the lack of availability of the test (at least as of January 1983 when there was only one commercial manufacturer of the testing kits), its cost, a potential reduction in the blood supply, a fear that use of a surrogate test would increase the contamination of the blood supply because persons who believed they might be infected with AIDS would donate blood in order to obtain the test and the test did not screen out all persons with AIDS.

On the one hand, it can be said it was foreseeable that use of the anti-HBc test would have reduced the risk of AIDS contamination since it would eliminate some blood from the groups at high risk for AIDS. One of the experts, Dr. Paul Holland, in a deposition, estimated 21 percent of the blood-transmitted AIDS cases could have been eliminated if the anti-HBc test had been implemented.

On the other hand, it can be said that it was not foreseeable that use of the anti-HBc would have reduced the risk of AIDS contamination since use of the test threatened to increase the number of high-risk donors who would donate in order to determine if they had AIDS. The evidence indicated the

---

[8]See *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234, 251, mentioning studies in 1987 and 1988 showing "there was no significant difference in the risk of contracting AIDS from homologous and directed donations."

test did not identify all persons with AIDS; in Dr. Spira's study of persons who had developed AIDS, the test identified only 80 percent of male homosexuals who had developed AIDS or its prodromal illnesses. Further, subsequent studies indicated a lack of correlation between the test results and AIDS rates in the general population.

Given these conflicting predictions at the time, we cannot say it was *reasonably* foreseeable in December 1984 that use of the surrogate test would have reduced the risk of AIDS contamination. Further, even if we were to accept N.N.V.'s position and conclude it was reasonably foreseeable in December 1984 that use of the anti-HBc test would have reduced the risk of AIDS transmission through blood products, we believe the other factors support a conclusion liability should not be imposed.

### 2. *Degree of Certainty That Plaintiff Suffered Injury*

There is no question here that N.N.V. suffered an injury, i.e., that he contracted HIV as a result of a blood transfusion.

### 3. *Closeness of the Connection Between AABB's Conduct and the Injury Suffered by N.N.V.*

N.N.V. contends the AABB's conduct is closely related to his injury because if the AABB had adopted standards requiring direct questioning and surrogate testing and had promoted directed donations, then the San Diego Blood Bank, which supplied the blood for his surgery, would have adopted those standards.

N.N.V., however, has pointed to no evidence showing that in this case any different result would have occurred if the AABB had adopted the standards he urges. On appeal, N.N.V. does not point to any facts in the record relating to the individual who donated the blood in his case. We have gleaned from the record that the donor was a White male in his 30's who had donated blood once in the past. We have not found any evidence suggesting this individual would have been eliminated from the donor pool by direct questioning, i.e., that this individual was a member of a high-risk group or would have self-identified himself as such (cf. *J.K. & Susie L. Wadley Research Inst.* v. *Beeson* (Tex.App. 1992) 835 S.W.2d 689, 699 [evidence presented that donor would have answered questions truthfully]), or that he would have been excluded by surrogate testing.

As to directed donation, the record here shows the blood bank in this case, in fact, offered directed donation despite the AABB's recommendations to

the contrary. We also note N.N.V. does not point to any evidence showing that no one in the circle of family, friends or coworkers who might have donated blood for his surgery was not infected with AIDS. (But see *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234, 253.)

We conclude N.N.V. presented no evidence to support a conclusion there was a close connection between the AABB's recommendations and his injury; he presented only speculation that adoption of the particular standards might have prevented his infection.

### 4. *Moral Blame*

Obviously, if it was not reasonably foreseeable in December 1984 that implementation of the standards would have reduced the risk of AIDS contamination, then the AABB cannot be held morally blameworthy for not adopting those standards urged by N.N.V.

Additionally, even if we were to assume it was foreseeable that recommendation of surrogate testing would have reduced the risk of AIDS transmission, we note such was only marginally foreseeable given the conflicting studies about its usefulness and legitimate concerns about the use of the anti-HBc test, i.e., that it would draw more infected persons into the donor pool.

Further, there were other reasons why surrogate testing was not recommended, including the lack of FDA approval of the anti-HBc test for AIDS screening, reduction of the nation's blood supply, concerns about the test's availability, and cost.

On appeal, N.N.V. suggests moral blame should be attached to the AABB's conduct, asserting: "Sloth and timidity are . . . the characteristics that the AABB exhibited when confronted by the AIDS epidemic. Rather than institute measures to protect patients in the face of exponential growth of the incidence of AIDS, the AABB elected to pursue a course of action to merely diminish the perception of the danger of AIDS and reduce questioning about the safety of the blood supply. The AABB chose not to take action consistent with known medical science to diminish the danger of AIDS in the blood supply. Rather than acting as a scientific medical standard setter by engaging in basic scientific methodology, the AABB did almost *nothing*." (Italics in original.)

N.N.V. in its argument ignores the fact the AABB, along with the American Red Cross and CCBC, did institute measures to protect patients

from AIDS, including issuing recommendations about AIDS education, self-deferral and directed donations. We note N.N.V. in his argument does not delineate what "known medical science" the AABB was ignoring; the record here shows the medical science in this area was still under debate. As to surrogate testing, the evidence in the record indicates the effectiveness of the anti-HBc test as a surrogate test for AIDS screening was not known; there were conflicting medical studies on its effectiveness; and legitimate concerns implementation of a surrogate test would actually increase the number of infected donors without being able to screen out all those who had AIDS.

In *Doe* v. *American Nat. Red Cross, supra,* 866 F.Supp. 242, a summary judgment case involving similar evidence and a claim that the American Red Cross should have adopted surrogate testing before January 1984, the court stated: "[T]he record proves that the Red Cross, other members of the blood banking community and government regulators articulated concerns about implementing surrogate testing, including the cost of such testing and its detrimental effect upon the blood supply. No reasonable inference can be drawn from the record that these concerns were anything but legitimate, and however those concerns may be resolved in hindsight, a factor of the time necessary to resolve them must be inserted into the equation when determining whether the industry had 'unduly lagged in the adoption of new and available devices.' Here, viewing the evidence most favorably to plaintiffs, all that can be said is that blood bankers and government regulators did not immediately follow the approach that plaintiffs' experts believed should have been followed. There is no evidence that blood bankers and government regulators were not struggling in good faith with issues of unknown dimension or that they were not reasonably attempting to chart what were then highly uncertain seas." (*Id.* at pp. 247-248, fn. omitted.)

These statements apply equally here and we reject N.N.V.'s contention that the record here supports a conclusion the AABB was morally blameworthy for "sloth and timidity" and failing to act. The record here shows the AABB in good faith acted in response to the threat of AIDS transmission through blood transfusions (although not as N.N.V.'s experts with the advantage of hindsight believe the AABB should have acted).

On appeal, N.N.V. also suggests that concerns about the cost and availability of blood were not legitimate concerns compared to the AABB's obligation to protect the safety of the nation's blood supply. In response, we note that as of January 1983, there was only one commercial manufacturer of the anti-HBc test and the costs were unknown; therefore, at that time it would not have been reasonable to urge use of a surrogate test whose

availability and cost were unknown as a main means of reducing the risk of AIDS transmission through blood products. Furthermore, costs and availability of the blood supply, we believe, were legitimate concerns. As the court in *Doe* v. *American Nat. Red Cross, supra*, 866 F.Supp. 242, 247, footnote 6, noted: "Of course, if the safety of the blood supply was the only legitimate concern of the blood banking community, any test that would keep any potentially infected blood from the supply should have been adopted. However, that was not the only legitimate concern. Cold-hearted though costs analyses often seem, responsible decision-makers cannot ignore the fact that resources are not unlimited and must be reasonably allocated. Moreover, blood bankers and governmental regulators also had to consider the extent to which the rejection of uninfected blood by a surrogate test would threaten the adequacy of the blood supply. Thus, they had to balance the number of persons who might be infected by transfusions of blood containing the AIDS virus against the number of persons who might die because blood was unavailable for necessary transfusions. The record does not establish that these numbers were clearly known or capable of responsible estimate by January 1984, and plaintiffs have thus not proven that the Red Cross was negligent in striking the balance which it did when rejecting surrogate testing."

We conclude the AABB's conduct in recommending against direct questioning, directed donations and surrogate testing warrants no moral blame.

### 5. *Policy of Preventing Future Harm*

We fail to see how the imposition of liability in these circumstances would further the goal of preventing future harm. Here we are dealing with medical and policy decisions at a time when knowledge about AIDS was evolving. At the time there did not exist any laboratory test to screen blood for HIV, and there did not exist any clear consensus within the medical and scientific community as to how the problem should best be addressed. The matter was still the subject of scientific debate, with advocates on both sides. The AABB's position was consistent with the majority view; no other national blood banking organization nor governmental agency recommended the direct questioning, directed donations and surrogate testing now advocated by N.N.V. in this case. The most that can be said is that, viewed with the clarity of hindsight, an argument can be made that the AABB chose the "wrong" side in the scientific debate.

To impose liability on a defendant for choosing the wrong side in a scientific debate, particularly when that side represented the majority viewpoint at the time, does not further the goal of preventing future harm. The

very nature of scientific debate is that the "right" answer has not yet emerged. Imposing liability thus would not aid in choosing the right side in a medical or scientific debate and might encourage rash or premature action rather than allowing a medical or scientific consensus to develop and mature.

We conclude imposition of liability would not further the policy of preventing future harm.

### 6. *Burden to the Defendant*

If liability were imposed here, then the AABB and other similar medical associations could be faced with a significant burden of litigation that might be impossible to avoid.

Under N.N.V.'s theory, medical associations such as the AABB would be held to a new, significantly more onerous standard than the currently existing standard of care for medical professionals.[9] The existing standard requires a medical professional to possess and exercise a level of knowledge and skill ordinarily possessed by members in good standing in his or her profession or specialty. (See BAJI Nos. 6.00.1, 6.01.)[10] The existing standard does not fault a medical professional for choosing among different methods that have been approved by the profession even if the choice later turns out to have been the wrong selection or not favored by other members of the profession. (See BAJI Nos. 6.00.1, 6.01, 6.03.[11])

Under N.N.V.'s theory, the AABB and similar medical associations and individuals would be held to a standard requiring not just ordinary or reasonable skill and knowledge but *extra*ordinary skill, knowledge and insight. Under N.N.V.'s theory, it would no longer be sufficient to rely on reputable scientific and medical information when choosing among alternative approaches. N.N.V. would impose the additional requirement that the

---

[9]See part II, *post*, for our discussion on the standard of care (professional).

[10]BAJI No. 6.00.1 (1996 rev.) (8th ed. pocket pt.) instructs the jury in a medical malpractice case that a physician has the "duty to have that degree of learning and skill ordinarily possessed by reputable physicians, practicing in the same or a similar locality and under similar circumstances . . . ."

BAJI No. 6.01 (1999 rev.) (8th ed. pocket pt.) instructs the jury that if the physician is a specialist, it is the duty of a physician "who holds [himself] [or] [herself] out as a specialist in a particular field of medical, surgical or other healing science, . . . [¶] . . . to have that degree of learning and skill ordinarily possessed by reputable specialists practicing in the same field and in the same or a similar locality and under similar circumstances."

[11]BAJI No. 6.03 instructs the jury: "Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician is not negligent if, in exercising [his] [or] [her] best judgment, [he] [or] [she] selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

medical association make the right selection. As we pointed out in our discussion of the prevention of future harm factor, the very nature of a scientific or medical debate is that there is no one right selection; the right selection can only be determined with hindsight.

Additionally, under N.N.V.'s theory, the rules regarding the standard of care would be changed. Under existing law, the standard of care applicable to a medical professional (i.e., the custom and practice in the relevant medical community) must be established by expert testimony. (See *Osborn* v. *Irwin Memorial Blood Bank, supra*, 5 Cal.App.4th 234, 276-279.) Under existing law, testimony, including expert testimony, is not admissible to show the standard of care should have been different; an expert is not permitted to " 'second-guess an entire profession' " as to what the standard of care should have been. (*Spann* v. *Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 655 [40 Cal.Rptr.2d 360].) Allowing an expert to second-guess the profession results in the standard of care being established by the lay opinion of the jury; i.e., the jury substitutes its opinion of what the standard of care should have been for what the standard of care was as established by the medical profession. Existing law holds the applicable standard of care should not be " 'evaluated by the ad hoc judgments of a lay judge or lay jurors aided by hindsight.' " (*Osborn* v. *Irwin Memorial Blood Bank, supra*, 5 Cal.App.4th at p. 279.) N.N.V. would abrogate this rule requiring expert testimony to establish the standard of care.

Here, N.N.V. seeks a jury finding as to what the standard of care should have been. N.N.V. asks us to reverse the grant of summary judgment essentially on the basis he has raised material issues of fact which would support a jury determination that the scientific and medical community, including the AABB, should have reached a consensus by December 1984 that the best methods for reducing the risk of AIDS contamination in the nation's blood supply were direct questioning, directed donations and surrogate testing. In other words, he seeks to have the jurors substitute their lay opinion for that of the scientific and medical community which had reached no consensus in December 1984 and of which a majority favored the recommendations made by the AABB. Adoption of N.N.V.'s theory would allow a few experts and a jury to second-guess the medical profession, resulting in a new and burdensome rule of liability and a burden of liability which might be impossible to avoid.[12]

We conclude imposition of liability under the circumstances of this case would impose a significant burden on the AABB.

---

[12]For example, in this case, as to the issue of directed donations versus using the voluntary donor pool, there was no medical or scientific consensus (and still appears to be none) as to which method better ensured the safety of the nation's blood supply. Under N.N.V.'s theory, which permits liability to be imposed based on a jury determination a particular consensus

### 7. *Consequences to the Community*

N.N.V. argues "[t]he consequences to the community for imposing potential liability upon the AABB would serve to improve the safety of the blood supply" by "[e]ncouraging the AABB to consider all relevant scientific evidence, and to put the safety of patients first in its considerations . . . ." Initially, we note N.N.V. does not point to what "relevant scientific evidence" the AABB failed to consider.

Second, we believe imposition of liability here would have adverse consequences to the public by chilling scientific and medical debate on important issues and leaving these matters to the often slow and cumbersome processes of governmental agencies or to the equally slow process of published medical journal articles and annual conferences. As one of the amici curiae, National Marrow Donor Program, explains:

"A standard setting body, such as the AABB, provides an arena in which researchers can and do come together to focus on the state of scientific knowledge. The standard setting process thus imposes a certain discipline and coordination to what would otherwise be independent research going on in many places at the same time. Without this arena or this discipline, there are only scholarly articles going back and forth in various journals that are then individually analyzed and responded to months later by other researchers. At best, without an active standard setting process, there may be only an annual meeting or isolated conference involving separate organizations often consisting of only one discipline where ideas will be exchanged and challenged.

"If liability is imposed on groups such as the AABB for failing to act as soon as an idea is proposed but not properly substantiated, the key researchers are likely to simply avoid the standard setting process. They will wait until a consensus has emerged from the slow ad hoc peer review journal process before being confident enough in new information and techniques to support new universal standards. More likely, they will even wait until a governmental agency has ground out a safe standard based on its lengthy procedures. The net result will be a significant slow-down in the process of developing medical techniques and protocols to develop new treatments for both existing and newly-emerging diseases."

We believe the public benefits from having private medical and scientific societies coordinating research, debating the merits of various scientific and

should have been reached by the medical and scientific community, it is readily conceivable that had the AABB recommended directed donations as N.N.V. urges, the AABB might today be facing a lawsuit from a person infected with AIDS from a directed donation arguing the AABB was negligent in recommending directed donations, an argument amply supported by experts who had recommended against directed donations.

medical information and technologies, and making recommendations to its members and the community at large. Leaving these matters solely in the hands of governmental agencies, which is a possible result of imposing liability here, would not further the public's interests nor guarantee the safety of the nation's blood supply. It would limit the debate and would deprive medical practitioners, scientists and governmental agencies of a valuable resource.

Additionally, we note imposition of liability could hinder reconsideration of established standards. Concerns about potential liability could skew the scientific and medical debate. If the established standard had represented a consensus within the relevant community (i.e., represented the standard of care in the field) such that adherence to that standard provided a shield against liability, a professional association, because of a threat of liability, might be reluctant to recommend a new standard that was still subject to debate and would not provide the same shield to liability. Selection of a new standard could leave a professional association open to liability for not adhering to an established consensus. Further, selection of a new standard could leave a professional association open to later claims that the association, by adopting a new standard, had essentially admitted the previous standard was wrong and therefore, under a theory such as N.N.V.'s, liability could be imposed. Alternatively, a professional association, when faced with new information challenging the established standard, could rush the scientific and medical debate and adopt a dubious standard in order to avoid liability based on a failure to respond quickly enough to new information. This latter situation does not represent a mere hypothetical; a majority of the New Jersey Supreme Court in *Snyder* v. *American Ass'n of Blood Banks, supra*, 676 A.2d 1036, 1055, which is discussed in more detail in part I. D., *post*, upheld a finding the AABB was negligent because the AABB was too slow to respond to the AIDS epidemic.[13]

We conclude adverse consequences to the community militate against imposing liability under these circumstances.

### 8. *Availability and Cost of Insurance*

The parties did not address this issue. We note that because there is a possibility that an association such as the AABB could face liability based on hindsight analysis and because improper standard setting could lead to class actions, the cost of insurance could be high.

---

[13]See also *Gilmore* v. *Memorial Sloan Kettering C.C.* (1993) 159 Misc.2d 953, 961 [607 N.Y.S.2d 546, 550] (triable issue of fact existed as to whether hospital was negligent in not instituting surrogate tests by March or October 1983 although such was not the industry standard, noting ". . . if [a given] industry itself was slow to recognize changes and adopt appropriate precautions, such failure cannot inure to its benefit.")

## D. *The Snyder Decision*

N.N.V. argues that we should follow the decision by the majority of the New Jersey Supreme Court in *Snyder* v. *American Ass'n of Blood Banks, supra,* 676 A.2d 1036 (hereafter *Snyder*).[14] We decline to do so.

In *Snyder,* the plaintiff contracted AIDS as a result of blood received during an August 1984 surgery. He sued the AABB for negligence in not recommending surrogate testing and the matter went to trial. The jury found the AABB was negligent in failing to adopt the anti-HBc surrogate test. A majority of the New Jersey Supreme Court affirmed.

The *Snyder* majority stated "[t]he determination of the existence of a duty ultimately is a question of fairness and policy," with "[a]n important, although not dispositive consideration" being "the foreseeability of injury to others from the defendant's conduct." (*Snyder, supra,* 676 A.2d 1036, 1048.) The majority noted, "Also important are the nature of the risk posed by the defendant's conduct, the relationship of the parties, and the impact on the public of the imposition of a duty of care." (*Ibid.*)

After concluding the AABB "[i]n many respects . . . wrote the rules and set the standards for voluntary blood banks," the *Snyder* majority "examine[d] the severity and foreseeability of the risk that blood transfusions could spread the AIDS virus." (*Snyder, supra,* 676 A.2d 1036, 1048.) The majority noted that in 1984 the overall mortality rate for AIDS was 40 percent but was approaching 100 percent for those who had AIDS for more than three years and "[t]he infection rate was increasing exponentially." (*Ibid.*) Thus the *Snyder* majority concluded the risk was severe. The majority also concluded the risk was foreseeable since a 1984 article in the New England Journal of Medicine confirmed the belief that AIDS could be transmitted by blood and blood products. (*Snyder, supra,* 676 A.2d at p. 1049.) The majority stated the "AABB knew, or should have known, in 1984 that the risk of AIDS infection from blood transfusions was devastating." (*Ibid.*)

The *Snyder* majority rejected the AABB's argument that considerations of public policy and fairness negated a duty of care. (*Snyder, supra,* 676 A.2d 1036, 1049.) The majority found there was no violation of any constitutionally protected right to participate in the political process because the

---

[14]The *Snyder* majority's decision was followed by *Weigand* v. *University Hosp.* (1997) 172 Misc.2d 716 [659 N.Y.S.2d 395]. (See also *Douglass* v. *Alton Ochsner Med. Found.* (La.Ct.App. 1997) 696 So.2d 136, 140 [64 A.L.R.5th 847], where a Louisiana appellate court reversed a summary judgment in favor of the AABB because ". . . genuine issues of material fact abound for determination as to whether the AABB owed a duty of care to plaintiffs under the contested facts of this case.")

AABB's liability did not rest on its right to petition government. (*Id.* at pp. 1049-1050.) Further, the majority did not believe imposition of liability "would chill debate on public-health issues and impair scientific discourse." (*Id.* at p. 1050.) The *Snyder* majority was also unpersuaded by the AABB's argument ". . . it did not accept the core test because of concerns about the effect that such a test would produce on the availability and cost of blood." (*Ibid.*) The majority stated: "These concerns, however, should not have diverted the AABB from its paramount responsibility to protect the safety of the blood supply. Recognition of that responsibility should have led the AABB to consider more carefully the risks to recipients from the transfusion of infected blood. When balanced against the devastating risks from a disease such as AIDS, the imposition of a duty of care on the AABB does not, in our opinion, offend the public policy favoring open debate on controversial scientific issues." (*Ibid.*)

The majority rejected the AABB's arguments that it was entitled to either a quasi-governmental or charitable immunity, noting that associations should not "enjoy immunity when they stubbornly reject persuasive evidence, unreasonably prolong the debate, and fail to inform their constituents of threats to the public health." (*Snyder, supra,* 676 A.2d 1036, 1055.)

The majority in a concluding section stated its opinion, "[f]airly read," did "not visit liability on the AABB because it was on the wrong side of a scientific debate or because it communicated its concerns to governmental officials." (*Snyder, supra,* 676 A.2d 1036, 1055.) The majority recognized "that the development of tests for infectious diseases often follows an indistinct path fraught with uncertainty, debate, trial and error, and even failure," but concluded that "[a]t some point in the process . . . participants should recognize that they have enough information to act responsibly and that the failure to act would be irresponsible." (*Ibid.*) The majority pointed out that "[p]rofessional associations concerned with matters of public health . . . are inescapably imbued with a public interest," and such associations should not "enjoy immunity when they stubbornly reject persuasive evidence, unreasonably prolong the debate, and fail to inform their constituents of threats to the public health." (*Ibid.*) The *Snyder* majority pointed to the evidence in the case before it, finding it sufficient to sustain a finding the AABB was negligent:

"The record reveals that the AABB led the charge against direct questioning of donors and surrogate testing. Viewed most favorably to the AABB, the evidence suggests that it was concerned that such questioning and testing would be of limited effectiveness and could diminish the supply of blood and blood products. A less favorable view suggests that the AABB resisted

surrogate testing because it did not want to suffer the added inconvenience and costs of such testing. In assessing the role of governmental and private decisionmakers involved with donor screening, the Committee concluded 'that it was reasonable to require blood banks to implement these two screening procedures [screening male donors for a history of sexual activity with other males and screening donated blood for the anti-HBc antibody] in January 1983.' [Citation.]

"On the record, the jury could have concluded that the AABB in 1984 unreasonably resisted recognizing that blood transmits HIV. That resistance led the AABB to sacrifice an uncontaminated supply of blood for one that was contaminated, but more readily available. The jury could have found that if the AABB had not been so intransigent, its members, particularly the [Bergen Community Blood Center (BCBC)], would have instituted surrogate testing. Further, the jury could have found that if the BCBC had instituted surrogate testing, it would have rejected [the unit of blood which infected the plaintiff]. Rejecting that unit could have prevented the transfusion of contaminated blood to William Snyder. It could have saved his health and his life. Against this background, we believe that the imposition of liability on the AABB is both fair and reasonable." (*Snyder, supra*, 676 A.2d 1036, 1055.)

Obviously, as explained in part I. C., *ante*, we disagree with the *Snyder* majority's decision. We find it flawed in many aspects. First, it is flawed because the majority failed to address the issue before it. The issue before the court was whether the AABB was negligent in failing to recommend surrogate testing. The *Snyder* majority, however, focused on a different issue, i.e., whether the AABB was negligent in failing to realize AIDS could be transmitted through blood transfusion.[15] In the *Snyder* case, as in this case, the evidence indicated that beginning in January 1983 at a time when there was still disagreement in the medical community as to whether AIDS could be transmitted through blood transfusion, the AABB, as well as the American Red Cross and CCBC, adopted measures based on the assumption that such transmission could occur. In other words, there was no issue in *Snyder* (nor is there in this case) about whether the AABB failed to realize AIDS could be transmitted through blood transfusions. The issue in *Snyder*, as here, is whether the AABB had a duty to adopt particular measures (such as surrogate testing) and whether the AABB was negligent in failing to do so

---

[15]Cf. *Doe* v. *American Nat. Red Cross, supra*, 866 F.Supp. 242, 247: "Plaintiffs' evidentiary support for their surrogate testing claim is scant. They rely primarily upon documents and testimony that suggests that by January 1984 it was generally accepted that AIDS was transmissible by blood. Evidence of that fact alone, however, is far from sufficient to sustain plaintiffs' burden. What plaintiffs must demonstrate is that the failure to adopt surrogate testing in response to the increasing recognition of the transmissibility of AIDS by blood was negligent. On that point plaintiffs have presented virtually no evidence at all." (Fn. omitted.)

given the information available at the time. Yet, nowhere in its analysis does the *Snyder* majority address the foreseeability of an increased risk of AIDS transmission due to rejection of the surrogate test.

We further note the *Snyder* majority's "foreseeability" analysis is flawed because it is a hindsight analysis; it focuses on the "devastating" consequences resulting from contaminated blood rather than looking to the circumstances, including the state of knowledge and recommendations of other relevant organizations, as they existed at the time the AABB adopted its standards. (*Snyder, supra,* 676 A.2d 1036, 1049.) This hindsight analysis is likewise apparent in the *Snyder* majority's analysis of whether the AABB breached a duty of care. The dissent in *Snyder* pointed out the majority had used a hindsight approach, stating:

"Admittedly, the decision reached by AABB and the government health agencies [on surrogate testing] appears negligent with the perspective of 20/20 hindsight. We know now that the AIDS virus is transmitted by blood and that people, like Mr. Snyder, were unfortunately infected through transfusions. In 1996, concerns about a diminished blood supply and public hysteria pale in the face of a blood recipient tragically infected with the AIDS virus. However, the participants in the vigorous public debate in 1983-84 about the utility of core testing did not have such a clear view of the future. Opponents of the core test expressed several concerns about core testing: (1) the test would exclude a half-million blood donors who did not have HIV, causing blood shortages and panic as hundreds of thousands of people who had engaged in no high-risk activity would fear that they had contracted HIV; (2) the test would screen out members of certain Asian ethnic groups, because many had been exposed to hepatitis, even though almost none were HIV-positive; (3) members of high-risk groups would come and give blood under the impression that they could then find out whether they had HIV; because the core test was not perfect, this would result in increased contamination of the blood supply." (*Snyder, supra,* 676 A.2d 1036, 1063 (dis. opn. of Garibaldi, J.).)

Furthermore, we find the *Snyder* majority's discussion of the public policy issues to be unpersuasive, as we explained in part I. C. 5. through 7., *ante.*[16] Contrary to the *Snyder* majority, we believe imposition of liability in these circumstances would not further the goals of preventing future harm and

---

[16]See also Note, *Quasi-Governmental Immunity: Should Organizations Receive Immunity for Charitable Works? — Snyder v. American Association of Blood Banks* (1998) 29 Seton Hall L.Rev. 256, 284, concluding "[t]he dictates of fairness and public policy did not prevail in Snyder," and urging the adoption of qualified immunity which would strike "the appropriate balance between holding parties accountable for breach of the duty of care in situations involving bad faith and granting immunity for discretionary decisions made in good faith."

"would chill debate on public-health issues and impair scientific discourse." (*Snyder, supra,* 676 A.2d 1036, 1050.) Further, we believe the *Snyder* majority decision improperly imposes an onerous burden on the AABB and other professional medical associations, requiring such an association to possess not just ordinary but extraordinary knowledge and skill in order to avoid liability and to have made the right choice in the scientific and medical debate.[17]

Accordingly, we reject N.N.V.'s decision to follow the majority's decision in *Snyder*.

### E. *Conclusion*

We conclude a professional medical association such as the AABB should not face liability for making a choice among competing scientific and medical opinions when the medical and scientific community has reached no consensus on the proper approach to a medical situation and there is no showing the association was involved in any fraud or bad faith.

The standards at issue here represent not only medical or scientific determinations but also policy determinations balancing the needs of maintaining the safety of the nation's blood supply while maintaining an adequate supply of blood for necessary transfusions. We believe deference should be given to professional associations that are making these sorts of policy decisions based on evolving medical and scientific knowledge. We believe public policy and the needs of the community are best served by encouraging free scientific and medical debate unhindered by threats of liability; the medical and scientific community, rather than the judicial system, is better situated for discussion and debate of emerging medical and scientific knowledge and for determining medical standards and policy. As long as a professional medical association acts in good faith in setting standards when medical and scientific knowledge is in a state of debate, we believe, as a matter of public policy, liability should not be imposed.

The trial court properly granted summary judgment on the basis the AABB owed no duty to N.N.V. to adopt particular standards.

### II

### *Breach of the Standard of Care*

■ Even if we were to assume N.N.V. raised facts sufficient to support a conclusion the AABB owed him a duty of care, we would not reverse

---

[17]See Note, *Snyder v. American Association of Blood Banks: Expansion of Trade Association Liability—Does it Reach Medical Societies?, supra,* 29 U. Tol. L.Rev. 149, indicating the *Snyder* decision established a new standard of expanded liability for medical professionals.

because we would find no triable issue as to whether the AABB breached the relevant standard of care. Since the matter here involves a medical determination by a professional medical association, it is appropriate to apply a professional standard of care. (See *Spann* v. *Irwin Memorial Blood Centers, supra,* 34 Cal.App.4th 644, 653; *Wilson* v. *Irwin Memorial Blood Bank* (1993) 14 Cal.App.4th 1315, 1326 [18 Cal.Rptr.2d 517]; *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234, 272; *Advincula* v. *United Blood Services* (1996) 176 Ill.2d. 1, 34-35 [678 N.E.2d 1009, 1025-1026] and cases cited therein [application of a professional standard of care to the conduct of blood banking organizations]; *Brown* v. *United Blood Services, supra,* 858 P.2d 391, 396 ["We join the clear and growing consensus of jurisdictions that view the production and safeguarding of the nation's blood supply as a professional activity, entitled to a professional standard of care."].)

Accordingly, the question is whether N.N.V. raised a triable issue of fact as to whether the AABB breached the standard of care in the relevant community, i.e., failed to use the knowledge, skill and care ordinarily exercised by members of the relevant community. The relevant community in these circumstances would include the American Red Cross, CCBC, National Institutes of Health, Public Health Service, CDC and FDA, i.e., national organizations investigating and setting standards relating to transmission of AIDS through blood products. The undisputed evidence establishes that none of these organizations or agencies recommended direct questioning, directed donations or surrogate testing as of December 1984. Thus, it seems apparent the AABB standards were consistent with and did not breach the relevant community's standards.

N.N.V. contends the FDA, CDC, National Institutes of Health and Public Health Service are not part of the relevant community because they "are governmental agencies that cannot, by any stretch of the imagination, be considered to be trade or professional associations involved with blood banking." He argues the relevant community was composed, at most, of three members only: the AABB, American Red Cross and CCBC and asserts the American Red Cross and CCBC were " 'members' of the AABB" and relied upon the AABB's standards and policies in issuing their joint statements with the AABB.[18] He points out "[t]he AABB states that it is without peers" and it is "the only organization [devoted] exclusively to blood

---

[18]But see *United Blood Services* v. *Quintana* (Colo. 1992) 827 P.2d 509, 513, footnote. 2: "The American Red Cross collects approximately one-half of the nation's whole blood supply and is the nation's largest blood bank. Most other blood banks are smaller regional or community blood banks that are organized into the American Association of Blood Banks and the [CCBC]. These three organizations—the American Red Cross, the American Association of Blood Banks, and the [CCBC]—account for most of the 13 million units of blood collected

banking and blood transfusion services." He notes that "[i]n medical malpractice cases, the professional standard of care is established by a 'community' of hundreds if not thousands of medical practitioners," and argues "[t]his large community helps ensure that the prevailing standard of care is not dictated by explicit or implicit collusion of a select few." He contends, "[W]hen the 'entire profession' consists of only three members, at most, its collective voice should be given less deference." He asserts in this case the ". . . standards reflect only the AABB's determination of the standard of care, and not the community's determination of the standard of care."

We reject N.N.V.'s assertion the CDC, FDA, National Institutes of Health, and the Public Health Service cannot be considered part of the relevant community solely on the basis they are governmental agencies rather than professional associations. We believe, in the circumstances of this case, they did constitute part of the relevant community, i.e., national organizations investigating and making recommendations concerning the transmission of AIDS through blood products. Nor does the record support N.N.V.'s assertion that the American Red Cross and CCBC were not active participants in the issuance of the standards. Additionally, we note the AABB, American Red Cross and CCBC do not represent just three voices; each has many members and their guidelines, developed by committees, represent many voices.

Moreover, we note that adoption of N.N.V.'s theory could result in an even smaller medical community for determination of care; under N.N.V.'s theory, the testimony of one expert who had adopted a minority position in his or her field and a panel of jurors could substitute their determination of what should have been the standard of care for that of the relevant medical and scientific community.

Finally, as pointed out in part I, *ante*, N.N.V. failed to raise any triable issues of fact showing the AABB acted unreasonably in rejecting the recommendations given the scientific and medical knowledge available at the time.

We conclude the trial court properly granted summary judgment on the basis the AABB did not breach the standard of care.

## III

### *Exclusion of N.V.'s Deposition*

N.V.'s deposition was taken on May 15, 1992, before the complaint was filed to perpetuate N.V.'s testimony as provided in Code of Civil Procedure section 2035. N.V. died in early January 1993.

from volunteer donors in the United States each year. The American Blood Resources Association represents the United States commercial plasma industry."

■ N.N.V. contends the court should have granted a new trial because it had erred in ruling the deposition testimony of his father, N.V., was inadmissible. N.N.V. contends he was prejudiced by the exclusion of N.V.'s deposition, which "would have supplemented and corroborated (but not have been cumulative of) R.V.'s testimony" about the conversation with Lugo. He contends the deposition testimony was admissible under the former testimony exception to the hearsay rule contained in Evidence Code sections 1290 to 1293.

Evidence Code sections 1290 to 1293 provide an exception to the hearsay rule for former testimony. However, the Law Revision Commission comment to Evidence Code section 1290 makes it clear the former testimony exception was not intended to apply to deposition testimony taken in the same action: "The use of a deposition taken in the same action, however, is not covered by this article. Code of Civil Procedure Sections 2016-2036 deal comprehensively with the conditions and circumstances under which a deposition taken in a civil action may be used at the trial of the action in which the deposition was taken . . . . These sections will continue to govern the use of depositions in the action in which they are taken." (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1290, p. 370.)

Code of Civil Procedure section 2025, subdivision (u) allows "any part or all of a deposition" to be "used against any party who was present or represented at the taking of the deposition, or who had due notice of the deposition and did not serve a valid objection . . . so far as admissible under the rules of evidence applied as though the deponent were then present and testifying as a witness, in accordance with the following provisions:

"
. . . . . . . . . . . . . . . . . . . . . . . . . . .

"(3) Any party may use for any purpose the deposition of any person . . . , including that of any party to the action, if the court finds any of the following:

"
. . . . . . . . . . . . . . . . . . . . . . . . . . .

"(B) The deponent, without the procurement or wrongdoing of the proponent of the deposition for the purpose of preventing testimony in open court, is . . . (iii) dead . . . ."

Code of Civil Procedure section 2035 provides a procedure for perpetuating deposition testimony before the filing of the complaint. It requires the

filing of a petition in the superior court of the county of residence of at least one of the adverse parties and notice to the adverse parties. (Code Civ. Proc., § 2035, subds. (c) & (e).) A deposition taken pursuant to the procedures of Code of Civil Procedure section 2035 "may be used, in any action involving the same subject matter that is brought in a court of the State of California, in accordance with subdivision (u) of Section 2025 against any party, or the successor in interest of any party, named in the petition as an expected adverse party." (Code Civ. Proc., § 2035, subd. (g).)

Lugo objected to use of N.V.'s deposition on the ground she was not given proper notice of the hearing on the deposition and did not appear at the deposition. The record shows Sharp Hospital, Children's Hospital and the San Diego Blood Bank were given notice of and appeared at the deposition. N.N.V.'s notice of the deposition gave notice to "Raquel V. Lugo, R.N. c/o Hospital Counsel, Children's Hospital and Health Center" and "Raquel V. Lugo, R.N. c/o Hospital Counsel, Donald M. Sharp Memorial Community Hospital." Lugo did not appear personally or through an attorney.

The notice was inadequate. Lugo was not employed by either Children's Hospital or Sharp Hospital; she was an employee of the Pediatric Cardiology Medical Group. Moreover, even if we were to conclude the notice to Lugo was adequate, we would not conclude N.V.'s deposition fit within the former testimony exception to the hearsay rule.

The former testimony exception requires there must have existed at the deposition the same or similar motive and opportunity for cross-examination of the deponent. (See *Wahlgren* v. *Coleco Industries, Inc.* (1984) 151 Cal.App.3d 543, 546 [198 Cal.Rptr. 715].)[19] N.N.V. argues the counsel for the other defendants who were present at the deposition had a similar motive as to Lugo, and N.N.V. asserts ". . . it is clear that the examination of N.V. covered matters which Nurse Lugo would have covered." We disagree. Since Lugo was not an employee of any of the defendants who were present at the deposition, none of the defendants had any motive to question N.V. as to the reliability and credibility of his identification of Lugo as the nurse with whom he and R.V. spoke. If anything, the hospital defendants would have had an interest adverse to Lugo's, i.e., an interest in establishing that if

---

[19]N.N.V.'s reliance on *Wahlgren* v. *Coleco Industries, Inc., supra,* 151 Cal.App.3d 543, is misplaced. That case involves the use of depositions taken in a prior unrelated action. As the Law Revision Commission comment to Evidence Code section 1290 states, "It should be noted that depositions taken in *another* action are considered former testimony under Section 1290, and their admissibility is determined by Sections 1291 and 1292." (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code, *supra,* foll. § 1290, p. 370, italics in original.) Here, in contrast, we are dealing with the deposition taken in the same action and therefore Code of Civil Procedure sections 2016 to 2036 govern.

any nurse failed to communicate a request for directed donation, that nurse was Lugo and not one of the nurse's employed by the hospitals. Under these circumstances, the court properly rejected admission of N.V.'s deposition in the trial against Lugo.

No reversal is merited on this ground.

## IV

### *Misconduct by Opposing Counsel*

 N.N.V. contends the trial court should have granted his motion for a new trial as to Lugo's liability because opposing counsel violated a pretrial ruling by the court.

Before trial, N.N.V. moved to exclude any testimony or reference during the trial to the AABB or Children's Hospital and to prohibit Lugo from attempting to assign fault to any dismissed defendant. The trial court, after an unreported discussion, stated, "it appeared this [was] not really an issue," and deferred ruling on the motion. The court also stated its belief shifting the blame to the other defendants would likely be precluded "as to certain of the defendants because they are out on legal determinations on the merits, and as to others, it wouldn't be permitted because there's no expert testimony to support it at this time . . . ." The court stated the defense should bring the matter "to the court's attention prior to doing anything to point the finger at some other co-defendant."

N.N.V. complains that during closing argument, Lugo's counsel violated this ruling by arguing Children's Hospital had available interpreters other than Lugo; Dr. Lamberti had staff other than Lugo who could have translated; Sharp Hospital had available other persons who could have acted as interpreters; a nurse other than Lugo appeared in the records noting that R.V. was breast-feeding N.N.V. about 7:30 p.m. and on the consent form signed about 8:00 p.m., during the time period R.V. testified she was talking to Lugo; and if a request for directed donation was made by R.V., the request was made to a nurse other than Lugo.

 A motion for a new trial rests within the trial court's discretion and will not be reversed unless the appellant shows a clear abuse of discretion. (*Mosesian* v. *Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 858 [236 Cal.Rptr. 778].)

 Initially, we note N.N.V. did not object to any of the purportedly improper arguments and thus waived the issue for appeal. (See *Las Palmas*

*Associates* v. *Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1247 [1 Cal.Rptr.2d 301] [" 'A party is foreclosed from complaining on appeal of misconduct during arguments to the jury where his counsel sat silently back during the arguments, allowed the alleged improprieties to accumulate without objection, and simply made a motion for a mistrial at the conclusion of the argument. [Citation.]' "].)

Second, we conclude no misconduct occurred. Even reading the record expansively and concluding the court ruled the defense was required to notify the court before arguing the liability of a dismissed defendant, the argument here did not violate such a ruling. The argument, read in context, is directed to the issues of whether any conversation about direct donation occurred and whether R.V. misidentified Lugo as the individual to whom she purportedly inquired about directed donation. The argument did not attempt to shift liability to dismissed defendants such as the hospitals; the argument raised evidence indicating either the conversation did not occur at all or that Lugo was misidentified. This argument was proper and supported by the evidence at trial.

N.N.V. failed to establish misconduct occurred warranting a new trial. No reversal is merited on this ground.

THE AABB'S CROSS-APPEAL

*Immunity Under Civil Code Section 43.7*

 Since we have held the trial court properly granted summary judgment on the basis the AABB did not owe or breach any duty of care, we need not address the issue of whether summary judgment was also warranted on the basis the AABB was entitled to qualified immunity under Civil Code section 43.7, subdivision (b) (hereafter section 43.7(b)).[20] We briefly address the issue and conclude the AABB was not entitled to immunity under section 43.7(b).

Section 43.7(b), in pertinent part, provides: "There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any professional society, any member of a duly appointed committee of a medical specialty society, or any member of a duly appointed committee of a state or local professional society . . . for any act or proceeding undertaken or performed within the scope of the functions of the

---

[20]We also do not need to address the arguments of the amici curiae that professional associations should be entitled to a qualified quasi-governmental immunity for setting voluntary standards.

committee which is formed to maintain the professional standards of the society established by its bylaws, or any member of any peer review committee whose purpose is to review the quality of medical . . . services rendered by physicians and surgeons . . . for any act or proceeding undertaken or performed in reviewing the quality of medical . . . services rendered by physicians and surgeons . . . if the professional society, [or] committee . . . acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he, she, or it acts, and acts in reasonable belief that the action taken by him, her, or it is warranted by the facts known to him, her, or it after the reasonable effort to obtain facts."

A " '[p]rofessional society' " is defined as including a medical organization of having membership including "at least 25 percent of the eligible persons or licentiates in the geographic area served by the particular society" if the society has more than 100 members. (§ 43.7(b).) A " '[m]edical specialty society' " is defined as "an organization having as members at least 25 percent of the eligible physicians within a given professionally recognized medical specialty in the geographic area served by the particular society." (*Ibid.*)

In construing a statute, our task is to determine and give effect to the Legislature's intent. (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632-633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) We " '. . . look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible to every word, phrase and sentence in pursuance of the legislative purpose. . . .' " (*Quintano* v. *Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 906 P.2d 1057].) The statute "must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity." (*Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128].)

The trial court rejected the AABB's claim of qualified immunity under section 43.7(b) on the basis the statute was limited to review of the quality of medical services, i.e., to peer review. The AABB argues section 43.7(b) grants immunity not only to peer review committees reviewing the quality of medical services rendered by health care providers, but also grants immunity to "any professional society . . . for any act or proceeding undertaken or performed within the scope of the functions of the committee which is formed to maintain the professional standards of the society established by its bylaws . . . ." Thus, the AABB argues, its establishment of

professional standards for the blood banking industry should be entitled to immunity under the statute. We disagree.

Our reading of the statute leads us to the conclusion the statute was intended to encompass peer review activities. The language of the statute provides immunity to a professional society, not for *establishing* standards, but for *maintaining* the professional standards, i.e., for ensuring that its individuals abide by the standards of the professional society. Our conclusion the statute applies to peer review activities is also supported by the Legislature's statements when it amended the statute to add a subdivision providing immunity to mental health professional quality assurance committees for acts or proceedings within the scope of a committee which was "formed to review and evaluate the adequacy, appropriateness, or effectiveness of the care and treatment planned for, or provided to, mental health patients . . . ." (See Civ. Code, § 43.7, subd. (a).) The Legislature, in enacting this subdivision, stated its intent was "to provide mental health professionals employed by counties and county-contracted facilities with the *same immunities presently possessed by medical societies* and hospital medical staffs while serving on quality assurance committees." (Stats. 1982, ch. 234, § 1, p. 765, italics added.) In other words, the Legislature indicated section 43.7(b) provides immunity for peer review type activities. To read section 43.7(b) as providing immunity for all activities of a professional medical society, including standard setting activities, we believe is an unreasonably expansive reading of the statute. While provision of immunity for standard setting activities of professional medical societies might be consistent with the legislative motive behind section 43.7(b), we conclude the Legislature did not provide such immunity in this statute.

No reversal is merited on this ground.

## DISPOSITION

The judgment is affirmed.

Benke, J., concurred.

**AMOS, J.,*** Concurring and Dissenting.—I concur in parts II, III, and IV of the majority opinion. Otherwise, I dissent.

I write separately to express my opinion regarding the duty owed by the American Association of Blood Banks (AABB) to recipients of blood from

*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

its member banks. The majority has chosen to frame the issue of duty very narrowly as "whether at the time of N.N.V.'s surgery it was reasonably foreseeable that direct questioning, directed donations and/or surrogate testing would have reduced the risk of AIDS contamination of the nation's blood supply." (Maj. opn., *ante*, at p. 1377.) While this narrow characterization of duty answers the issues in this case, it leaves open the question of whether AABB has any type of duty to recipients of blood transfusions and provides little, if any, guidance to the trial courts in the future. Further, the policy analysis engaged in by the majority suggests the AABB owes no duty to blood recipients under any circumstances. I disagree.

## ROLE OF THE AABB

While courts have been reluctant to impose liability on nonprofit trade associations, two of the primary considerations in imposing liability have been the role and dominance of the association in the industry and the control over the behavior of its members. (See Note, *Snyder v. American Association of Blood Banks: Expansion of Trade Association Liability—Does It Reach Medical Societies?* (1997) 29 U. Tol. L.Rev. 149, 163.)

The AABB is more than a voluntary trade association. The AABB has substantial power over the operation of blood banks and is the governing body of a significantly self-regulated industry. It sets standards for the collection, screening and distribution of blood and assures compliance with those standards by accrediting and inspecting its member blood banks. The New Jersey Supreme Court and the Illinois Supreme Court have recognized the significant and influential role of the AABB.

"By words and conduct, the AABB invited blood banks, hospitals, and patients to rely on the AABB's recommended procedures. The AABB set the standards for voluntary blood banks. At all relevant times, it exerted considerable influence over the practices and procedures of its member banks . . . . On behalf of itself and its member banks, the AABB lobbies legislatures, participates in administrative proceedings, and works with governmental health agencies in setting blood-banking policy. In many respects, the AABB wrote the rules and set the standards for voluntary blood banks." (*Snyder* v. *American Ass'n of Blood Banks* (1996) 144 N.J. 269, 293 [676 A.2d 1036, 1048].)

"[United Blood Services] is a member of the AABB, an association of blood banks and blood banking professionals engaged in the collection of whole blood from volunteer donors. AABB promulgates, establishes and publishes standards and policies for the collection, processing and distribution of blood, blood components and tissue by it [*sic*] members. AABB also

inspects and accredits its members based on compliance with these standards and policies and issues advisory recommendations and guidelines. Federal and state governments generally accept AABB standards as authoritative." (*Advincula* v. *United Blood Services* (1996) 176 Ill.2d 1, 8 [223 Ill.Dec 1, 678 N.E.2d 1009, 1013].)

In California, the AABB standards are incorporated in statutory and regulatory provisions for blood banks and blood transfusion services. (See Health & Saf. Code, § 1602.5, subd. (a)(1); Cal. Code Regs., tit. 17, §§ 1024, 1002.)

The Food and Drug Administration permits a licensed facility to adopt the procedures of the AABB as long as the procedures are consistent with, and at least as stringent as, the requirements of the Code of Federal Regulations. (*Zaccone* v. *American Red Cross* (E.D. Ohio 1994) 872 F.Supp. 457, 460; 21 C.F.R. § 606.100(d) (1999).) Further, numerous cases absolve blood banks from liability to transfusion recipients upon a showing of compliance with the guidelines of the AABB. (See *Douglass* v. *Alton Ochsner Med. Found.* (La.Ct.App. 1997) 696 So.2d 136, 138 [64 A.L.R.5th 847], and cases cited therein.)

AABB represents the interests of its members, which have a substantial financial stake in the regulation of the industry. Blood is a billion-dollar business. (*Snyder* v. *American Ass'n of Blood Banks, supra,* 676 A.2d at p. 1050.)

### APPLICATION OF RESTATEMENT SECOND OF TORTS SECTION 324A

The imposition of duty in this case requires a determination of whether the first two elements of the Restatement Second of Torts section 324A (section 324A) are applicable and an analysis of the public policy arguments tendered by AABB. A finding of negligence under section 324A requires: (1) the actor undertake, gratuitously or for consideration, to render services to another; (2) the services rendered are of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of its undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking. Recovery requires proof of each of the well-known elements of any negligence claim: duty, breach of duty, proximate cause and damages. To impose a duty, the actor must

specifically undertake to perform the task it is charged with performing negligently. The scope of the undertaking defines the scope of the duty. (*Artiglio* v. *Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)

AABB undertook to render services to others (its blood bank members) by setting standards for screening, obtaining and distributing blood and by monitoring the application of those standards through its accreditation process. The ultimate beneficiaries are the patients receiving blood transfusions and AABB recognizes this in its mission statement, where it refers to the "highest standards of care for patients and donors." AABB acknowledges its services benefit these patients. Thus, the first two elements of section 324A are satisfied and a duty should be imposed unless an exception applies for public policy reasons.

In *FNS Mortgage Service Corp.* v. *Pacific General Group, Inc.* (1994) 24 Cal.App.4th 1564 [29 Cal.Rptr.2d 916], the court reversed a summary judgment and held the International Association of Plumbing and Mechanical Officials (IAMPO), a nonprofit association controlled by officials engaged in the enforcement of local plumbing codes, had a duty to consumers who acquired and utilized the pipe bearing a "UPC" designation indicating compliance with IAMPO standards. In imposing a duty the court noted, "the question of duty must be considered in light of the existing law, rather than as a novel abstraction," as set out in section 324A. (*FNS Mortgage Service Corp., supra*, at p. 1571.) The situation here is similar. An association that sets the standards in a particular industry and asserts substantial influence over that industry and its members seeks to avoid the imposition of duty to the ultimate consumer. As in *FNS*, the application of section 324A and the policy considerations require imposition of a duty.

The majority distinguishes the holding in *FNS* applying section 324A because that case "did not address the liability of a trade association based on its professional judgment in recommending standards to be used in the industry" and the policy considerations are different here. (Maj. opn., *ante*, at p. 1376.) In applying section 324A, the *FNS* court did consider the application of standards and noted, "IAPMO has undertaken to render the service of inspecting pipe manufacturers and delisting those who are unwilling or unable to adhere to *standards* it has promulgated." (*FNS Mortgage Service Corp.* v. *Pacific General Group, Inc., supra*, 24 Cal.App.4th at p. 1572, italics added.) Here, AABB has undertaken to set standards and assure compliance through accreditation.

### POLICY CONSIDERATIONS

The majority concludes imposition of a duty upon AABB will not serve to prevent future harm since the state of the knowledge in this area was

evolving and AABB should not incur liability for choosing the wrong side in an ongoing scientific debate. In addition, the majority concludes imposition of a duty will place a significant burden on AABB as a result of increased litigation and the creation of a new, more onerous standard for medical professionals that would require extraordinary skill, knowledge and insight. The majority confuses the issue of duty with breach. A duty is breached under section 324A when one fails to exercise reasonable care in the performance of its undertaking. If a duty were imposed on AABB, it would not be breached if there was an ongoing debate and the state of knowledge in a particular area was still evolving. Nor would the standard of care be changed. In determining whether a breach had taken place, AABB would still be held to a professional standard of care in accordance with current case law. (*Spann* v. *Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 654 [40 Cal.Rptr.2d 360]; *Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 271-272 [7 Cal.Rptr.2d 101].)

The majority also concludes imposition of a duty on AABB would chill scientific and medical debate and would hinder reconsideration of established standards. This argument has been rejected by the two courts that have had occasion to consider it. (*Snyder* v. *American Ass'n of Blood Banks, supra,* 676 A.2d at p. 1049; *Weigand* v. *University Hosp.* (1997) 172 Misc.2d 716, 722 [659 N.Y.S.2d 395, 399].) These concerns are outweighed by the devastating risks from the receipt of tainted blood. If no duty is imposed, the business and cost considerations of the members of AABB are likely to play a significant role in the decision making process and may pose an obstacle to change or reconsideration of standards. AABB bears the burden of demonstrating the exception from liability it seeks is clearly supported by public policy. (*FNS Mortgage Service Corp.* v. *Pacific General Group, Inc., supra,* 24 Cal App.4th at p. 1571.) AABB has failed to meet its burden to establish it is entitled to a public policy exclusion.

To put the argument in perspective, one must consider whether AABB had a duty to recommend the ELISA test after it was discovered and kits were available to test for AIDS. Under the majority's analysis, the answer would be "no." Yet, as soon as ELISA testing supplies became commercially available, blood facilities had a duty to test all blood supplies for antibodies to the AIDS virus. (*Kirkendall* v. *Harbor Ins. Co.* (8th Cir. 1989) 887 F.2d 857, 860.) To impose a duty on the AABB at this stage of the medical research process is both reasonable and fair.

When the role of the AABB is considered along with the risks from the receipt of tainted blood, a duty should be imposed on the AABB to set adequate standards for the screening, testing and distribution of blood. In

establishing those standards, it is appropriate to apply a professional standard of care. However, because of the evolving state of knowledge in December 1994, there was no breach of that duty. On that ground, I would affirm the judgment.

The petition of plaintiff and appellant for review by the Supreme Court was denied January 19, 2000.