Edward P. JAPPELL, et al., Plaintiffs,

v.

AMERICAN ASS'N OF BLOOD BANKS, Defendant.

No. Civ.A. 01–0228–A.

United States District Court, E.D. Virginia, Alexandria Division.

Sept. 10, 2001.

Alexander Laufer, Fairfax, Virginia, Peter Vangsnes, Ashcraft & Gerel, Washington, DC, for plaintiffs.

Edward J. Longosz, II, Washington, DC, for defendant.

## MEMORANDUM OPINION

CACHERIS, District Judge.

This matter is before the Court on Defendant American Association of Blood Banks' Motion to Dismiss. Plaintiffs oppose the motion.

### Background

Bernadette Mary Jappell was born at Arlington Hospital in Arlington, Virginia, on April 10, 1984. Motion for Judgment ("MFJ") ¶ 4. While at Arlington Hospital, she received transfusions of blood and blood products from at least four donors.

MFJ ¶¶ 5, 10. One or more of the blood products was contaminated with the Human Immunodeficiency Virus ("HIV"), the virus that causes AIDS. MFJ ¶ 6. Plaintiffs Edward and Alice Jappell, Bernadette's parents, had her tested for HIV in July 1993, because she had stopped growing and had repeated bouts of pneumonia; the test showed that she had HIV. MFJ ¶ 8. Plaintiffs' investigation revealed that the donor of the contaminated blood was an HIV-infected male who had traveled abroad and had surgery, with a blood transfusion, in 1983. MFJ ¶ 11. In November 1983, Arlington Hospital had screened the donor according to guidelines promulgated by Defendant American Association of Blood Banks ("AABB") but failed to learn of the donor's risk factors. MFJ ¶ 12. Bernadette developed AIDS and died January 22, 1998. MFJ ¶ 13.

Plaintiffs Edward P. Jappell and Alice L. Jappell, individually and as administrators of the estate of Bernadette Jappell, filed suit in the Circuit Court of Fairfax County, Virginia, and the suit was properly removed to this Court by Defendant pursuant to 28 U.S.C. §§ 1332 and 1441. Plaintiffs allege that Defendant negligently failed to advise its member blood banks to use reasonable, available methods to screen out contaminated blood. Plaintiffs further allege that Defendant's failure to do so proximately led to contaminated blood being transfused into Bernadette, her subsequent contraction of AIDS, and her eventual wrongful death from AIDS-related complications.

### Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint and should be granted only if it appears beyond doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *De Sole v. United States*, 947 F.2d 1169, 1177 (4th

Cir.1991); *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989). In passing on a motion to dismiss, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Moreover, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8. The complaint need only state sufficient facts to enable the defendant to draft a responsive pleading. *See* 5A Wright, Miller & Cooper, Federal Practice and Procedure 2d § 1357.

## Analysis

Defendant contends that it owed no duty to Bernadette which is cognizable under Virginia law. Defendant also argues that Plaintiffs are judicially estopped from bringing this claim against it and, further, that Defendant's actions or omissions were not the proximate cause of Bernadette's contracting AIDS. Each argument is addressed in turn.

### 1. *Defendant's Duty*

In 1983, Defendant's member blood banks collected approximately half of the blood supply in the United States. *See* AABB News Release, January 14, 1983 (attached as Ex. 3 to Pltfs' Oppos. to Motion to Dismiss). Plaintiffs argue that Defendant, having voluntarily undertaken to set standards for blood banks to ensure the safety of the nation's blood supply, owed a duty of reasonable care to victims of foreseeable negligence in setting the standards, such as Bernadette Jappell. Defendant replies that it owed no duty to

Bernadette that required it to promulgate a standard instituting surrogate testing by its member blood banks of all donated blood.[1] To date, no Virginia court has considered the precise issue of the duty, if any, owed by a standard-setting trade association of blood banks to a patient injured from tainted blood collected by a member blood bank.

The prima facie case of negligence includes proof of a legal duty, breach of that duty, and consequent injury. *Chesapeake and Potomac Telephone v. Dowdy,* 235 Va. 55, 61, 365 S.E.2d 751, 754 (1988). Whether a duty existed is a question of law. *Thompson v. Skate America,* 261 Va. 121, 127, 540 S.E.2d 123, 126 (2001). Once a duty of care is established, whether the duty was violated is a question of fact. *Id.*

Defendant first claims that Plaintiffs' Motion for Judgment is legally insufficient because it does not allege with specificity what duty Defendant owed to Bernadette. The Motion for Judgment states that Defendant "breached the duties owed by it to plaintiffs and decedent, in that it negligently did not advise ... the use of available reasonable and prudent screening procedures...." MFJ ¶ 18. Plaintiffs refer to Defendant's role in issuing reasonable and prudent guidelines for its members to prevent the transfusion of contaminated blood, MFJ ¶¶ 15–16, a role that was allegedly not fulfilled when Defendant failed to issue such guidelines to require surrogate testing. MFJ ¶ 17.

The Court finds that the Motion for Judgment sufficiently alleges that Defendant owed a duty to Plaintiffs. The Federal Rules of Civil Procedure require only

---

1. Surrogate testing in this case refers to identifying people who are at high risk for AIDS by testing for an antibody to the hepatitis B core antigen. Tests had shown that a majority of people who had contracted, or were at risk of contracting, AIDS had also been exposed to hepatitis B and would test positive for the antibody.

a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). A fair reading of the Motion for Judgment suggests that the duty arose from Defendant's role as a standard-setter for the blood bank industry. Thus, the Motion for Judgment adequately expresses both the existence of a duty and its scope, albeit not as directly as the Court might prefer. Insofar as the pleadings are concerned, the existence of a duty has been sufficiently alleged.

■ Next, Defendant argues that it owed no duty of care to Bernadette. Duty is not an abstract concept but is always tied to a particular individual or class of persons to which an individual belongs. *Dudley v. Offender Aid and Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878, 882 (1991). In determining whether a duty exists, the Court considers factors including foreseeability of harm, the likelihood of injury, the magnitude of the burden of guarding against that injury, and the consequences of placing such a burden on the defendant. *See Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 159, 207 S.E.2d 841, 845 (1974) (citations omitted).

■ The Court finds inapposite much of the case law cited by Defendant in support of its claim of no duty. Cases that require a showing of a special relationship generally involve an allegation that the defendant failed to control the criminal acts of a third party, who injured the plaintiff. *See, e.g., Nasser v. Parker*, 249 Va. 172, 180, 455 S.E.2d 502, 506 (1995) (doctor and hospital not liable for failure to warn victim after her assailant released from hospital); *Fox v. Custis*, 236 Va. 69, 74–75, 372 S.E.2d 373, 376 (1988) (parole officer not liable for the actions of parolee who committed murder, assault, and arson); *see also* Restatement (Second) of Torts § 315(a). Such criminal acts by a third party cannot rea-

sonably be foreseen, and so the law requires a plaintiff to make a showing of a special relationship before duty will attach. *Marshall v. Winston*, 239 Va. 315, 318, 389 S.E.2d 902, 904 (1990).

That is not the scenario presented in this case. Plaintiffs allege that Defendant's role as a standard-setter for the blood banking industry gave rise to a duty to recipients of transfusions. While Arlington Hospital effectuated the standards set by Defendant, it cannot be said that its donor screening activity is akin to the third parties' criminal actions in the cases cited by Defendant. Plaintiffs do not contend that Defendant had a duty to stop Arlington Hospital from doing a wrongful act in violation of the AABB standards; instead, it was Defendant's alleged negligence in not requiring surrogate testing that led to the *absence* of such testing by Arlington Hospital. Thus, the line of cases requiring a plaintiff to show a special relationship with the defendant in certain circumstances is not applicable here.

While it is true that the AABB is a voluntary organization, its substantial power over the operation of blood banks has been well noted by other states' Supreme Courts. *See Snyder v. American Ass'n of Blood Banks*, 144 N.J. 269, 293, 676 A.2d 1036, 1048 (1996) (noting that "[i]n many respects, the AABB wrote the rules and set the standards for voluntary blood banks") and *Advincula v. United Blood Services*, 176 Ill.2d 1, 8, 223 Ill.Dec. 1, 678 N.E.2d 1009, 1013 (1996) ("Federal and state governments usually accept AABB standards as authoritative."). In addition, the Food and Drug Administration permits a licensed facility to adopt AABB procedures as long as those procedures are consistent with and at least as stringent as the requirements in the Code of Federal

Regulations.[2] *Zaccone v. American Red Cross,* 872 F.Supp. 457, 460 (N.D.Ohio 1994); 21 C.F.R. § 606.100(d) (2001). Defendant promulgated standards to "improv[e] the quality and safety of human blood transfusions." *Standards for Blood Banks and Transfusion Services,* 10th Ed.1981, Introduction (Ex. 2 to Plaintiff's Oppos. to Motion to Dismiss). Although Defendant argues it had no duty to an identifiable class of persons to which Bernadette Jappell belonged, it is the recipients of blood products, including Bernadette, who are the beneficiaries of the standards set by Defendant. As such, in a general sense, it was foreseeable that improper standards could lead to injury to the class of persons to which she belonged.

In the early 1980s, when AIDS was still a mysterious but clearly devastating disease, the likelihood of injury from improper standards was difficult to assess; in retrospect, it is clear that while the likelihood that any particular transfusion would involve contaminated blood was small, the consequences for the unlucky recipient of such a transfusion were disastrous. Guarding against that injury plainly would have placed a burden on Defendant, largely because of the expense for member blood banks of performing the surrogate test on every pint of donated blood. The Court is also cognizant that placing such a burden on Defendant may produce some negative consequences. For example, the Preface to Defendant's 1981 Standards manual, apparently the version in use in the time period relevant to this case, states Defendant's "reluctan[ce] to specify standards where the present state of knowledge is inadequate." *Standards, supra,* Preface. Where delay in setting a particular standard would be negligent, the duty to act without negligence may require Defendant to make difficult choices somewhat earlier than it would prefer.

■ Having weighed these factors, the Court finds that on balance, imposing this duty on Defendant is proper. When Defendant undertook to ensure the safety of the nation's blood supply by issuing standards, it took on a duty to transfusion recipients to ensure those standards were drafted without negligence.

A more difficult question is the foreseeability of the specific injury suffered by Bernadette in the absence of the surrogate testing standard. In 1983, it was still a matter of scientific debate whether AIDS was transmitted through blood; only after January 1984 was that issue definitively settled with the publication of a seminal article in the *New England Journal of Medicine.*[3] By April 1984, when Bernadette was transfused with the contaminated blood, the risk of infection was clearly foreseeable. However, even prior to the donation of the contaminated blood in November 1983, the major players in the blood bank industry adopted measures based on their assumption that such transmission was possible. *See N.N.V. v.*

---

**2.** It is rather disingenuous for Defendant to insist that its recommendations to its members merely followed the public health agencies' lead. Granted, the agencies were doing most of the research and were disseminating the study data. However, the agencies set the *minimum* standard for blood banks to follow; experts on both sides agree that a particular blood bank could conduct a test that was not required by the government. *See* Deposition of Donald P. Francis, M.D., at 37–40 (Ex. 1 to Deft's Reply); Expert Report of Herbert Per-

kins, M.D., at 9 (Ex. 4 to Deft's Reply). Indeed, by April 1984 several blood banks did begin to engage in surrogate testing of various types. *See id.* Thus, the AABB could have required such testing of its members.

**3.** James W. Curran, *et al., Acquired Immunodeficiency Syndrome (AIDS) Associated with Transfusions,* 310 *New England Journal of Medicine* 69, 73–74 (Jan. 12, 1984).

*American Ass'n of Blood Banks,* 75 Cal. App.4th 1358, 1390, 89 Cal.Rptr.2d 885 (4th Dist.1999) *(review denied* Jan. 19, 2000).

■ The Court has found that Defendant had a general duty to ensure a safe blood supply for the nation's transfusion recipients, including Bernadette Jappell, but whether the specific test advocated by Plaintiffs would have saved Bernadette is a matter for the jury. Hindsight tells us that of the many millions of transfusions made in 1984, only a relative handful of recipients received tainted blood. Whether Defendant, in 1983 and 1984, acted in due care in responding to the risk posed by contaminated blood is a question of fact. It is for the jury to determine whether Defendant's failure to institute a policy requiring surrogate testing in 1983 or early 1984 breached its duty to transfusion recipients to ensure a safe blood supply.

Defendant argues that it believed more negative consequences than benefits could flow from instituting surrogate testing. Specifically, even though the surrogate test was not a precise test for AIDS and identified only 80 to 90 percent of AIDS patients, there was concern that high-risk populations could begin to donate blood in greater quantities in order to be tested for AIDS, in a fashion. This might have led to more contaminated blood entering the blood pool, rather than less. In addition, studies showed that the surrogate test was over-inclusive and might have led blood banks to reject blood that was *not* contaminated with HIV, leading perhaps to a blood supply shortage. Such a shortage might have harmed many more patients than were actually, in the end, transfused with contaminated blood.

These may be valid reasons for not instituting a surrogate testing standard, and defenses to Plaintiffs' claim of negligence. They do not negate, however, the Court's finding that Defendant had a duty to transfusion recipients, including Bernadette Jappell, to ensure a safe blood supply.

## 2. *Judicial Estoppel*

■ Defendant argues that Plaintiffs are judicially estopped from seeking to hold it liable for Bernadette's injury. In their prior lawsuit, Defendant contends, Plaintiffs alleged that Arlington Hospital and several of its employees were the sole agents responsible for the harm to Bernadette, in that they failed to follow Defendant's standards for donation procedures. Defendant contends that Plaintiffs made this allegation without challenging the standards themselves. To make a case for judicial estoppel, Defendant must show: 1) Plaintiffs adopt in this suit a position that is factually inconsistent with a stance taken in a prior suit; 2) the prior inconsistent position was accepted by the court; and 3) Plaintiffs intentionally misled the court to gain an unfair advantage. *Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir.1996) (citations omitted).

■ The Court finds that Defendant's argument is without merit. Although Plaintiffs did not include Defendant in their first state court suit, they alleged in their Motion for Judgment that the screening techniques used by Arlington Hospital and its agents *should have included surrogate testing.* Motion for Judgment (September 4, 1998) ¶ 21. That allegation is not factually inconsistent with the present lawsuit. Nor was that allegation admitted or proven in the prior case, which ended in an out-of-court settlement. Nor, finally, is there any evidence that Plaintiffs are trying to abuse the judicial process. *See Lowery,* 92 F.3d at 223. Thus, Plaintiffs are not judicially estopped from pursuing their claims now.

### 3. Proximate Cause

■ Finally, Defendant contends that Plaintiffs cannot show that Defendant's actions proximately caused the injury to Bernadette. Essentially, Defendant argues that the actions taken by Arlington Hospital, which violated standards established by Defendant, broke the chain of causation. The Court disagrees. This case is about whether Defendant was negligent in drafting the standards, not whether Arlington Hospital and the other defendants in the state court suit properly followed those standards.

There is a strong argument that, had Defendant included a surrogate testing requirement in its standards for member blood banks, Arlington Hospital would have conducted the Hepatitis B core testing. In his deposition, the associate pathologist who worked in Arlington Hospital's blood bank during 1983 and 1984 indicated that although it did not feel constrained by them, *in practice* the hospital followed every one of Defendant's standards, because AABB accreditation was important to the hospital. *See* Deposition of Richard Palmer, M.D., at 52–53 (Ex. 2 to Deft's Mem. in Support of Motion to Dismiss).[4]

In addition, Defendant had two opportunities to institute a surrogate testing policy: before the November 1983 donation and before the April 1984 transfusion. Even if the Court agreed that Arlington Hospital's November 1983 acceptance of the donation, in violation of Defendant's standards, clearly broke the chain of causation, clearly no actor intervened to absolve Defendant from its alleged negligence in not instituting a testing requirement in early 1984.

■ Finally, Defendant argues that proximate cause requires that the injury be foreseeable. *See Wyatt v. Chesapeake & Potomac Tel. Co.*, 158 Va. 470, 478, 163 S.E. 370, 372 (1932). As discussed above, at least by January 1984 it was clearly foreseeable that some transfusion recipients would receive blood contaminated with the AIDS virus, if such blood was not screened out of the supply. Injury to a blood transfusion recipient was thus the natural and probable cause of allowing contaminated blood to enter the system. Again, though, even though injury was foreseeable, whether Defendant's decision to forego requiring the surrogate test was negligent is a question for the jury.

Plaintiffs contend that "[h]ad AABB issued a standard requiring surrogate testing, the donor's blood would have been thrown away." Pltfs' Oppos. to Motion to Dismiss at 23. The Court notes, however, that there is no direct evidence in the record that this particular donor's blood would have tested positive for exposure to hepatitis B and therefore been excluded. Studies in the relevant time period estimated that the success rate of surrogate testing was approximately 80 to 90%. At oral argument on the Motion to Dismiss, Plaintiffs suggested their expert will testify that the correlation of the surrogate test with those at high risk for AIDS makes it a medical certainty that the donor in this case would have tested positive for exposure to hepatitis B. This testimony will be a factor for the jury to weigh in assessing the likelihood that Defendant should—or,

---

4. Whether Arlington Hospital would have followed a standard requiring surrogate testing is a question of fact not decided here. The Court notes that in the state court suit, Plaintiffs alleged that it was the *failure* of Arlington Hospital and its agents to follow certain of Defendant's standards that led to the contaminated blood being accepted and eventually transfused into Bernadette.

indeed, could—have taken action to prevent the harm to Bernadette.

### Conclusion

Defendant had a duty to Bernadette Jappell and other transfusion recipients to ensure that the nation's blood supply was safe. Although the state of medical knowledge at the time was such that Defendant's decision not to require surrogate testing might have been reasonable, such that Defendant did not breach its duty of care, that is a matter for the jury to decide. Further, Plaintiffs are not judicially estopped from bringing this suit, and reasonable minds could disagree on whether the lack of a surrogate testing standard proximately caused Bernadette Jappell to receive a contaminated transfusion.

For the foregoing reasons, the Motion to Dismiss is DENIED. An appropriate Order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1) Defendant American Association of Blood Banks' Motion to Dismiss is **DENIED;** and

2) The Clerk of the Court shall forward copies of this Order and the accompanying Memorandum Opinion to all counsel of record.